## In re THATCHER.

(Circuit and District Courts, N. D. Ohio, W. D. November 11, 1911.)

### No. 2,172.

*(Syllabus by the Court.)*

1. ATTORNEY AND CLIENT (§ 38*)—OFFICE OF "ATTORNEY"—"PROPERTY RIGHT"—DISBARMENT.

The office of attorney at law is not a property right, but is an extraordinary privilege, which one is entitled to have conferred on him upon showing his possession of certain moral and educational qualifications, which he must reasonably retain in order to continue in that relation. Admitted, he thereafter stands as an officer of the court, with a duty thereto superior to every other demand upon him, called upon to use his honest judgment and effort to assist the court to a just determination of the issues affecting his client. His office is primarily indispensable to the administration of justice, and is intimate and peculiar in its relation to and vital to the well-being of the court. He may not be deprived of his office, except in the exercise of a sound judicial discretion, after a formal hearing, with due notice to him, and upon strict proof of professional unfitness.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 50–61; Dec. Dig. § 38.*

For other definitions, see Words and Phrases, vol. 1, pp. 630–632; vol. 8, p. 7586; vol. 6, p. 5729; vol. 8, p. 7770.]

2. ATTORNEY AND CLIENT (§ 38*)—DUTIES—OPPOSITION TO RE-ELECTION OF JUDGE.

One, being an attorney at law, has the undoubted right to oppose a judge for re-election, and may, in support of his opposition, refer to the official acts of such judge. His professional duty requires that he assist in keeping from the bench a person unworthy of that honor. This same duty, in even higher degree, demands, as a correlative, that in executing his opposition he refrain from scandalous and libelous attacks, alleged to be founded on court records, distorted and garbled for such purpose.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 50, 61; Dec. Dig. § 38.*]

3. ATTORNEY AND CLIENT (§ 37*)—DISBARMENT.

Disbarment of an attorney at law, when not adjudged for a contempt of court, is had for the primary purpose of protecting the court and public from the official ministrations of one who, because of disclosed moral unfitness, has forfeited a right to the court's confidence, and has lost thereby his usefulness as an officer of the court. That it may oper-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ate as a punishment of the delinquent for his misconduct is incidental only.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 50–63; Dec. Dig. § 37.*]

4. ATTORNEY AND CLIENT (§ 38*)—DISBARMENT—PROFESSIONAL MISCONDUCT.
Respondent, having an ill will against M., a judge of the state court in which respondent practiced, and moved by such ill will to defeat M. for re-election, personally published and circulated, in the district in which M. was then a candidate, certain pamphlets containing scurrilous and libelous statements and comments reflecting upon the conduct of M. as a judge, and impugning the purity and fairness of judicial proceedings conducted by M. supporting said charges by references to court records garbled and distorted by respondent to effect a libelous purpose. In the compilation and publication of these libels respondent employed his professional standing as a member of the local bar, conversant, therefore, with the proceedings in M.'s court, to give the scandalous and unjust statements readier acceptance. *Held*, these acts of respondent did not constitute contempt of court, but were professional misconduct involving moral turpitude, not because merely he libeled M., nor because M. as the object of his attack was a judge who was a candidate for re-election, but for the special reason that, from the nature of such libels and in the manner of their publication by him, he involved his professional standing therein.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 50–60; Dec. Dig. § 38.*]

5. ATTORNEY AND CLIENT (§ 38*)—DISBARMENT—PROFESSIONAL MISCONDUCT.
Three promissory notes, of which two were made by M. and H., the other bearing the indorsement of M. and H., were paid by M. and were each held by respondent as attorney for M. upon a written contract for fees, wherein it was provided that respondent was to have two-thirds of the amount of recovery upon these and other claims of M. in respondent's hands for collection up to the amount of $2,250, and in addition all recoveries over that amount; the right of action in M. as to each of said three notes being for contribution against H. M. was insolvent, and his right of contribution was subject to certain offsets belonging to H., as respondent well knew. Respondent, having vainly endeavored to obtain M.'s agreement that H. should be sued upon each of said first two notes as if the same had not been paid, but in the name of the original payee, one R., who was then a stranger to each of said notes, thereupon, without the knowledge of M. entered into a written contract with R., whereby R. was to pay respondent a fee contingent upon recovery in an action on said first notes, and, further, without the knowledge of M., and R. never having been a party to said third note, procured one D., an attorney at law, who was ignorant of the facts, to bring suit in the name of R., upon each of said three notes, against H., and as if neither of said three notes had been paid, and as if R. were the owner thereof, with intent thereby to deceive H. as to the status of each of said three notes, and, to delude H. into refraining from making such defenses to either of said three notes as might be available to him, had he been sued in either cause of action upon contribution, in which way only, upon the facts, could he properly be sued. *Held*, respondent therein was guilty of professional misconduct involving moral turpitude.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 50–61; Dec. Dig. § 38.*]

6. ATTORNEY AND CLIENT (§ 41*)—DISBARMENT—PROFESSIONAL MISCONDUCT.
Respondent, having repeatedly attempted to persuade opposing counsel, M. & F., to permit a certain bill of exceptions to be filed in this court to contain matters referring to proceedings on motion for new trial, submitting to said M. & F. a certain "condensed statement of the substance"

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of affidavits for insertion in said bill as a part thereof, and said M. & F. refusing to consent to the inclusion of said "condensed statement" in said bill, referred said bill to said M. & F. for approval without said "condensed statement," and, having procured thereby the approval of said bill by said M. & F. indorsed thereon, thereafter caused said "condensed statement" to be inserted in said approved bill at an obscure and out of the way place, and thereupon procured said bill, as so added to, and without the consent or knowledge of said M. & F., to be signed and sealed by the trial judge. *Held*, respondent was thereby guilty of professional misconduct involving moral turpitude.

[Ed. *Note.*—For other cases, see Attorney and Client, Cent. Dig. § 53; Dec. Dig. § 41.*]

7. ATTORNEY AND CLIENT (§ 53*)—"MALPRACTICE"—DECEIVING CLIENT.

One G., being unable to speak or understand any language but Polish, and to read or write even his name in any language, employed respondent, as his counsel, upon a contingent fee, to prosecute in this court a claim for personal injury. Nearly two years after the bringing of such suit, the same not having been tried, G. gained an erroneous impression that respondent's disbarment in the state court prevented his attention to the case, and thereupon engaged Mrs. S., a professional interpreter for Polish people, to help him settle his claim, and through a reputable attorney, introduced to him by Mrs. S., effected an adjustment for money then paid to him, all transactions relating thereto being in English, and all information thereof being given to G. through the translation of Mrs. S. Respondent, learning of the fact, sought and obtained G. to sign by mark a written repudiation to accompany a tender back of the amount of the settlement, the money therefor being furnished by respondent, who upon refusal of the tender prepared and caused G. to verify and sign a reply, which he filed to defendant's answer pleading the settlement, which reply alleged that the same was procured by fraud and deceit practiced upon G. Preliminary to and in preparation for the drafting of said reply, respondent caused a subpoena to issue in the case for Mrs. S. to appear for her deposition, although she was neither ill nor about to leave the jurisdiction, and examined her as to the transaction of the settlement. The testimony thus had from Mrs. S. showed no condition of fraud or deceit of G., and otherwise was radically at variance with material averments of said reply. Seven months later respondent had the case assigned for trial, whereupon it was adjudged that the averments of the reply were not supported by any evidence.

Contemporaneously with his inducement to G. to attempt impeachment of the settlement, respondent prepared and filed with a justice of the peace a suit in attachment against G. upon a claim of one-half the amount of the settlement for respondent's fees in the case and his expenses, and procured thereby a garnishment of the money. G. was served with process in this suit while in respondent's office in response to respondent's invitation to there appear and sign the aforesaid repudiation. The writs were wholly in English and unintelligible to G., who was allowed by respondent to remain in ignorance of their effect and of his rights in the action against him brought by his said counsel until after the appearance day, at which time judgment was entered against him in favor of respondent by default. After the termination of the trial in this court wherein this conduct of the respondent was revealed to the court, respondent released G.'s money, securing to himself only reimbursement for expenses incurred by him in the trial and the costs of his personal action against G.

*Held*, that it was unprofessional for respondent to prepare, and to cause an illiterate and grossly ignorant client to verify and file a pleading which the client could but imperfectly understand through the medium of translation, and in support of which respondent could have no reasonable expectation that competent testimony was procurable; that,

because of the natural resentment inflaming respondent, his offense in this behalf might be condoned, were it not for other attendant circumstances, and that, after his anger cooled, he imposed this pleading upon the court; that respondent's suit against G. while acting as the latter's counsel, and, having knowledge of G.'s helpless ignorance of the proceedings 'and of his reliance upon respondent as respondent's client, without providing that G. should be duly apprised of his right as defendant to the action, whereby G. became in default, was unethical and unprofessional in high degree; that the conduct of respondent in these matters was "malpractice," as that term is used in the rule affecting the continuance of attorneys at the bar of this court, of which the court should take cognizance.

[Ed. Note.—For other cases, see Attorney and Client, Dec. Dig. § 53.*
For other definitions, see Words and Phrases, vol. 5, pp. 4313, 4314.]

**8. ATTORNEY AND CLIENT (§ 43*)—DISBARMENT—EVIDENCE.**

The right to take depositions is not general, but is limited to emergencies and occasions pointed out by statutes and judicial decisions. It is such an otherwise uncontrollable appropriation of power peculiar to courts, conferring for the time being upon an attorney of record, on his own initiative, a function of the court, namely, to compel attendance of witnesses, that to exceed the plain limits of its exercise is to abuse the right, to be reprehended as professional misconduct, when aggravated by persistence and scienter. Respondent in the cause at bar, after repeated advice from the court that the issues to which they were afterward addressed would not be allowed presentation in this case, and after urgent admonition that he should not ask the court to consider such questions for any purpose, took three depositions in three distant cities, upon notice ,under the title of the case, by him personally written and given, to produce, and thereby did produce, testimony not responding in any degree to any issue in this case, but which was in fact wholly impertinent and immaterial, and substantially scandalous and unfit either for the court's consideration or to be placed in the record. *Held*, that the use of the court's name and process to bring into the record such matters, having regard to the scienter and purpose which are clearly imputable to respondent, was professional misconduct, which the court should consider for the illumination it affords in determining the reflection upon respondent's professional character cast by the acts upon which formal charges are based herein.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 59, 60; Dec. Dig. § 43.*]

**9. ATTORNEY AND CLIENT (§ 60*)—PROFESSIONAL MISCONDUCT—FINDINGS OF STATE COURT—CONSIDERATION BY FEDERAL COURT.**

Disbarment by a court of the state over which a federal court has jurisdiction does not ipso facto deprive the subject of his right to appear in the federal court, even upon the authentication of the fact upon the records of the latter court. Federal courts enjoy the right to determine for themselves the qualifications of members of their bars; but judgment of disbarment rendered by a state court in a proceeding over which it had jurisdiction, and in which the rights of the accused attorney have been duly safeguarded, and containing a finding of facts upon which judgment is rendered, may be accepted by the federal court as a prima facie establishment of facts upon which this court may determine the existence or otherwise of professional misconduct.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. § 83; Dec. Dig. § 60.*]

**10. ATTORNEY AND CLIENT (§ 58*)—DISBARMENT—SENTENCE.**

In determining the corrective to be applied for professional misconduct, the court should attempt a judgment commensurate with the character of respondent as suggested by the several instances in their aggre-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

gate effect. Accordingly, it is *held* that the offenses charged and established by the evidence against respondent, being matters engaging his attention at various times and upon different subjects, whereby variant phases of disregard for professional obligations are exhibited, demand nothing less of the court than an order of permanent disbarment, which is therefore entered.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 76–78; Dec. Dig. § 58.*]

In the matter of Charles A. Thatcher. Application for disbarment. Order striking name from the rolls.

C. A. Seiders, George P. Kirby, and Harry B. Thompson, prosecuting committee.

John J. Sullivan and Rhea P. Cary, for respondent.

KILLITS, District Judge. We approach the consideration of the charges and of the testimony affecting the standing of Charles A. Thatcher at the bar of this court with the feeling that the case has an importance much beyond cases of this kind generally, in that it affects broader interests than those of the respondent, much as it means to him. From the disbarment of Mr. Thatcher by the Supreme Court of Ohio in June, 1909 (80 Ohio St. 492, 89 N. E. 39), has come a plain conflict between the legislative and judicial branches of the state government. and an assiduous propaganda has cultivated a widespread public feeling that that court in its judgment and proceedings went to the limits of judicial arbitrariness and arrogance and actually invaded the sacred right of free speech.

In these days, when railing at the courts is somewhat fashionable, and is found to be a convenient means for inflaming public sentiment, when the wisdom of the fathers in providing for an independent judiciary finds many to question, that case is indeed important which deals indirectly at least, and none the less surely, with the issue which respondent and his friends have raised against the highest judicial authority of Ohio, and in which they have arrayed in antagonism two of the three branches of the state government. That the records before us compel something of a review of the state court's judgment will plainly appear as this discussion proceeds. In the unique and unfortunate circumstances before us, we find demand for analysis of the case in greater length than would otherwise be necessary.

The attention of this court was first called to the respondent's alleged professional delinquencies through the presentation of a certified copy of the judgment disbarring him and the demand of the committee prosecuting him in the state court, which committee was composed of members also of the bar of this court, that Thatcher ipso facto be removed from our rolls. This the court declined to do, but did refer the matter for advice to a committee of three members of the bar of this district, who were without the local atmosphere and wholly beyond the possibility of any bias whatever. The committee's recommendation was that a committee of prosecution be appointed to bring respondent formally to the bar of this court. December 9, 1910,

the court acted upon the recommendation of this advisory committee, filing a memorandum in which the delay was explained, and in which these passages occur:

"This court entertains no opinion upon the merits of this matter save to honor the presumption that Mr. Thatcher, once having been found worthy of admission to its bar, continues in that happy state; but we do most strongly feel that the present anomalous and equivocal situation should be determined as soon as that consummation can be decently effected. It seems clear that the highest consideration toward this court, toward another court with which relations of comity must always exist, and toward Mr. Thatcher himself, demands action. The presence on the court files of the report of a committee whose advice the court sought challenges action. * * * If the Supreme Court of Ohio rightfully and justly characterized Mr. Thatcher in its judgment then the dignity of the federal court requires that it refuse Mr. Thatcher professional privileges after a proper inquiry; otherwise it must abdicate a claim that it is particular touching the moral qualifications of those who are permitted to plead at its bar. If the state court has perpetrated an injustice of which Mr. Thatcher is a victim, no better opportunity for vindication may be offered him than an investigation in this court. If he succeeds here, his rehabilitation in the state court would doubtless be but a matter of time. As the matter now stands, his partisans may refer to his ability to practice in this court as a ground for censure of the state court, and his enemies may also find in the same situation an occasion for cavil at this court. Each tribunal must therefore suffer in dignity and respect. That this very unsatisfactory and unpleasant situation may be ended, this court proposes now to follow the advice invoked of the body it designated last year, and appoint a committee to make a presentment upon which a hearing may be had."

In selecting these gentlemen special attention was given to avoid any one who might be said to be within the influence of that portion of the local bar assumed by respondent to be leagued against him. We feel that our judgment in the selection was fully justified, and deep obligation is felt by the court to each member of the committee for the manner in which this vexatious, thankless, and laborious task was performed.

In order that respondent might not be embarrassed in the trial of several cases on our docket, the committee was directed to make no report prior to January 25, 1911. The committee did not in fact report until March 6th. Respondent's demurrers having been overruled, on the 23d of May the case came on to be heard upon the charges and answer.

[1] Early in the case the court found itself at variance with the respondent and his counsel touching the nature of the office of attorney at this bar and of the proceedings in disbarment. We wholly disagree with respondent that the right to practice law is a property right, to be treated with all the incidents peculiar to property. On the other hand, we hold that it is merely an extraordinary privilege, valuable to the holder, it is true, and granted to him for life on certain conditions, upon the reasonable maintenance of which by him depends his continuance in office.

By approved practice and ex necessitate an attorney at law is clothed in some measure with the court's power. For instance, his engagement in a case gives him the right to command the court's processes of summons and subpœna, and the court's officers are at his call to

execute his will in behalf of his client for many purposes. His retainer gives him the ear of the court, and also affords him the court's protection against a refractory client. He is the only proper vehicle of communication between the court and his client, and upon him the court must rely for the performance of many intimate and responsible duties. These and other considerations suggest that to call him an officer of the court is by no means a figure of speech. The accepted code of legal ethics is clear that in the presentation of his client's cause it is his duty to help save the court from error and imposition and to aid the court to a proper determination of the law and the facts. Theoretically, at least, it is counsel's first duty to see that the issue is justly decided, however his client is affected. Every jurisdiction not controlled by constitutional limitations requires that a candidate for admission to the bar shall show himself to have those qualifications, mental, educational, and moral, which promise a capacity to faithfully represent a client and to earn and retain a court's confidence.

Such being, then, the office, intimate and peculiar in its relation to, and vital to the well-being of, the court, and indispensable to the administration of justice, to say that it occupies the plane of property is to say that a court may not by its own proper methods protect itself against its creatures. The right to be admitted to practice, when the proper qualifications are shown to be possessed, is conceded. A court may not arbitrarily refuse the privilege. Once admitted, the right to maintain his professional position against anything less than a judgment of exclusion, arrived at after a formal hearing upon notice and in the exercise of a sound and judicial discretion, likewise abides with an attorney at law. This is the tenor of all the authorities. This is the extent of his "estate" in his profession. No case cited to us or known to us says anything else, even in dictum, unless distorted from its context, or that the right to practice law has all the incidents of a property right. If Ex parte Garland, 4 Wall. (71 U. S.) 333, 18 L. Ed. 366, so frequently referred to by respondent's counsel, has any bearing at all on this question, it is in this line.

The language of Chief Justice Marshall in Ex parte Burr, 9 Wheat. (22 U. S.) 529, 6 L. Ed. 152, uttered 80 years ago, is the present law on the subject, and protects fully both attorney and court:

"On one hand, the profession of an attorney is of great importance to an individual, and the prosperity of his whole life may depend upon its exercise. The right to exercise it ought not to be lightly or capriciously taken from him. On the other, it is extremely desirable that the respectability of the bar should be maintained, and that its harmony with the bench should be preserved. For these objects, some controlling power, some discretion, ought to reside in the court. This discretion ought to be exercised with great moderation and judgment; but it must be exercised, and no other tribunal can decide, in a case of removal from the bar, with the same means of information as the court itself."

The court uttering these words surely did not consider that it was dealing with a property right. Except where some constitutional or statutory provision intervenes, all reported attempts to review judgments of disbarment are found to have encountered this same theory

of the status of the practice of law as a privilege, in distinction to an absolute right.

[3] Nor do we agree with respondent and his counsel that punishment is the end sought in disbarment proceedings. That may be true where the ground is contempt of court; but where, as here, the charges involve moral unfitness, punishment is not at all the end. In the language of the Supreme Court in Ex parte Wall, 107 U. S. 265, 2 Sup. Ct. 569, 27 L. Ed. 552:

"The proceeding is not for the purpose of punishment, but for the purpose of preserving the courts of justice from the official ministration of persons unfit to practice in them."

It would seem necessary only to call attention to the fact that a court would be fully warranted in disbarring an attorney, convicted and already under punishment for a felony, to show that it is improper to generalize by saying that all proceedings in disbarment are to impose punishment. No one would say that disbarment in such a case was to inflict a second punishment.

The admission of one to practice law is a certificate from the court that such person possesses mental and moral qualifications for an office which has intimate and vital relation to the administration of justice, and, in the language of Chief Justice Lane, in State v. Hand, 9 Ohio, 42:

"Whenever the courts shall become persuaded that an attorney has lost these qualifications, essential to his usefulness, and necessary to the safety of his employers, they are wanting in their duties if they do not take away his means and destroy his opportunities for mischievous action."

As Justice Field said, in Ex parte Wall, supra:

"He is disbarred in such case for the protection of both the court and the public."

That it also punishes him is wholly incidental and beside the question.

We hear this case holding that we may be properly asked to deprive respondent of a privilege which this court in admitting him conferred upon him, and which it is alleged he has forfeited by a course of conduct showing him to be unworthy of the court's continued confidence, and in the exercise of this function we have afforded respondent the fullest opportunity for defense, even to the extent, in his behalf, of disregarding many well-known restrictions of procedure, and in the introduction of evidence, and in deciding it we act upon the principle that the action is so analogous to a criminal prosecution that strict proof of professional misconduct only is available to remove him.

Admission to and continuance at the bar of the federal courts are not the subjects of statutory regulation, but are governed wholly by rules which the several courts adopt and enforce in the exercise of powers inherent in their constitution. Early in the national jurisprudence it was held that the power to admit and remove was the exclusive province of a federal court. Ex parte Burr, 2 Cranch, C. C. 379, 4 Fed. Cas. 2186; mandamus refused by Supreme Court 9 Wheat. (22 U. S.) 529, 6 L. Ed. 152. And the principle was upheld directly by

the Supreme Court in Ex parte Secombe, 19 How. (60 U. S.) 13, 15 L. Ed. 565, in this language by the Chief Justice:

"It has been well settled, by the rules and practice of common-law courts, that it rests exclusively with the court to determine who is qualified to become one of its officers, as an attorney and counselor, and for what cause he ought to be removed. The power, however, is not an arbitrary and despotic one, to be exercised at the pleasure of the court, or from passion, prejudice, or personal hostility; but it is the duty of the court to exercise and regulate it by a sound and just judicial discretion, whereby the rights and independence of the bar may be as scrupulously guarded and maintained by the court, as the rights and dignity of the court itself."

This case has been repeatedly followed by federal courts, the Supreme Court cases being Ex parte Garland, 4 Wall. (71 U. S.) 333, 18 L. Ed. 366; Ex parte Bradley, 7 Wall. (74 U. S.) 373, 377, 19 L. Ed. 214; Bradley v. Fisher, 13 Wall. (80 U. S.) 335, 20 L. Ed. 646; Randall v. Brigham, 7 Wall. (74 U. S.) 523, 535, 19 L. Ed. 285; Ex parte Wall, 107 U. S. 265, 281, 285, 2 Sup. Ct. 569, 27 L. Ed. 552.

Undoubtedly, therefore, under this authority, which stands unquestioned in the federal practice, respondent's status is to be decided solely by the application of the facts to the rules of this court respecting admission and exclusion. They are:

"Attorneys at law, solicitors in chancery, and proctors and advocates in admiralty, who have been admitted to practice as such in the Supreme, or in the Circuit or District Court of the United States, or who have practiced for one year as such attorneys, counselors or solicitors in the highest court of a state or territory, shall be admitted to practice in this court upon producing evidence of such admission and practice, and upon certificate of some member of the bar of this court of good moral character and standing."

"Upon admission to practice the person so admitted shall take an oath to support the Constitution of the United States and of fidelity to his clients and to the court."

"For malpractice or other sufficient cause the court may direct the name of any attorney, counselor, solicitor, proctor or advocate to be stricken from the roll, and thereafter, unless restored, such person shall be incapable of appearing in any cause in this court."

The practice in the exercise of the power to exclude, that it may not be "arbitrary and despotic," but is the result of a "sound and just judicial discretion," whereby the rights and independence of the bar may enjoy the same scrupulous regard as the court's dignity, is controlled by federal decisions which, here briefly referred to, dispose of the respondent's many interlocutory and preliminary objections to the progress of his case. Thus:

Proceedings may be instituted by letter, affidavit, or motion. Randall v. Brigham, supra.

The judicial inquiry is not restricted to official acts. In re Dormenon, 2 Wheeler, Cr. Cas. (N. Y.) 344. See Ex parte Garland, supra; Ex parte Robinson, 19 Wall. (86 U. S.) 513, note, 22 L. Ed. 205.

The trial must be for the specific offense charged. Ex parte Bradley, supra.

It is discretionary with the court to determine what amounts to misconduct. Ex parte Secombe, supra; Ex parte Bradley, supra.

Disbarment in one court will not affect the right to appear before

an independent tribunal. Bradley v. Fisher, supra; Ex parte Tillinghast, 4 Pet. (29 U. S.) 108, 7 L. Ed. 798.

These authorities control us, and no authority from any state jurisdiction which depends upon constitutional or legislative provisions is of value.

[9] Early in the matter the court took the position, following Ex parte Tillinghast, supra, and Bradley v. Fisher, supra, that a formal showing in this court of respondent's disbarment in the state Supreme Court would not ipso facto remove him from our rolls, but that this court reserved the right to determine for itself whether the facts found against him by that court, although it was with competent jurisdiction and acted in a formal inquiry, constituted "malpractice or other sufficient cause" requiring that the court's confidence in him, as one of its officers, should be removed, and the committee was directed to present certain charges against him on the findings of fact in the Supreme Court of Ohio, that a proper inquiry might be had concerning the application of the court's rules to such facts.

Under these instructions, the committee brought to the attention of the court four charges; the first embodying the findings and judgment of the Supreme Court, and the remaining three dealing with conduct of the respondent imputed for malpractice in matters before this court and never heretofore examined into.

The character of these charges will be noted as each one is specially discussed. At the threshold of the hearing the respondent challenged the admissibility of the record of his case in the state court. Charge No. 1 is to the effect that a committee duly appointed to prepare and file charges and specifications against said Charles A. Thatcher, an attorney at law, in the state courts, filed with the Supreme Court of the state charges embracing 17 specifications, imputing to the said Thatcher guilt of unprofessional conduct involving moral turpitude and misconduct in his said office as attorney, and attaching as a part of this charge by way of exhibit a copy of said charges and specifications; that thereupon said Thatcher filed an answer to the said charges, and that thereafter said case duly came on to be heard, whereupon, after full consideration, said court adjudged respondent guilty of the charges of fact found in all the specifications save four, and because of such findings removed him from its roll of practitioners at its bar; that the facts of which said Thatcher was in said case found guilty are and constitute malpractice, and sufficient cause to strike the name of said Charles A. Thatcher from the rolls of this court as attorney at law, solicitor in chancery, and proctor and advocate in admiralty.

Notwithstanding the demurrer of the respondent, the court is clearly of the opinion, following Randall v. Brigham, supra, that this charge is couched in sufficient language and is so enframed as to apprise respondent and the court of the acts of which he has been found guilty by the Supreme Court of Ohio and to require him to defend here, and we can conceive of no function served by respondent's demurrer than to question whether an adjudication of the respondent's guilt of certain lines of conduct, by a court whose jurisdiction to try such a case is not open to question, may be accepted, not as conclusive, but

as establishing prima facie, that respondent did in fact commit the acts imputed to him for malpractice by the state court in its judgment upon its findings of fact.

On the hearing this court took that view of the record of the state court, and permitted the committee to rest its case on the first charge upon the facts, after the introduction of a certified record of the Supreme Court's findings.

The question, however, is not material now; for, upon respondent's claiming the right to attack the state court's finding of facts, he was permitted to introduce the entire record before the state court, and to follow with oral testimony of himself and others by way of attempting to explain, extenuate, or otherwise modify the findings against him. In the exercise of this privilege, he found himself admitting all the acts upon which the state court predicated its findings of fact, and which that court insisted disclosed his professional unworthiness, leaving the only matter open to be determined whether such conduct on his part warrants his disbarment here, and we are able, from such admissions, to pass upon the facts which underlie the findings of the state court, without reference to that court's conclusions at all.

This situation renders one vehement contention of the respondent almost academic, and we would not notice it for any purpose, if it did not seem necessary, in view of the history of the controversy of which respondent is the central figure. Wherefore briefly it will be discussed.

Against the court's position that the full faith and credit rule should be applied to the state court's finding of facts, inasmuch as it had jurisdiction and had acted judicially, while not accepting as controlling our judgment of the law, it was urged most strongly that the record made in the Supreme Court of Ohio discloses facts impeaching the court's judgment and so gravely reflecting on the fairness of the proceedings against Thatcher that we ought not accept against him any conclusion there reached.

The first 12 of the specifications in the charges in the state court deal with four campaign circulars put out by respondent in the pre-election campaign of 1908. These four circulars seem to be different editions of an attack on Judge Morris, whose candidacy for re-election as common pleas judge respondent was violently opposing, with additions from time to time of campaign material against other candidates. As part of one of them (Exhibit C, State Court Record, 80 Ohio St. 581, 89 N. E. 39) was the bulletin of certain labor organizations advocating the defeat for re-election of Judges Shauck and Price for the Supreme bench. These men were re-elected, and their participation in the hearing and determination of Thatcher's case is the occasion for a violent attack upon the integrity of the Supreme Court and its judgment.

An issue is raised in the case before us in that behalf by respondent, requiring an examination for its justification. It is asserted in support of the respondent's contention that Judges Shauck and Price were disqualified in morals from sitting in judgment upon respondent's

conduct in that political campaign, and that for them to take part in the case was to sit in their own interest.

This proposition cannot be intelligently nor fairly discussed without a knowledge of the facts and the object and tone and character of the circulars. We have carefully read the bulletin of the labor people against these judges, and have as carefully studied it in its relation to Thatcher's pamphlet embodying it in Exhibit C, and we are unable to find in it from beginning to end a word or thought which, in our judgment, passes the point of fair criticism or legitimate argument against either of these judges as candidates for re-election. It is apparently a truthful "statement of the records of the candidates for the office of judge of the Supreme Court of Ohio," drawn from public sources and set forth with a moderation and absence of rancorous color that is entirely commendable.

That the courts, especially reviewing courts, who sit aloof from the human interest in the cases before them, lag behind in this progressive age and enforce hoary principles whose application to modern industrial conditions is unfortunate and provocative of injustice, is a tenet held by a large and growing element of society, but one need not be in entire sympathy with this faith to yet be ready to accord to those holding it every opportunity to utter it, nor to see that this action of the labor organizations was well within the bounds of legitimate criticism.

[2] That an elector, be he an attorney or not, has the right to refer to the record of a judge, who is a candidate, for argument against his re-election, and may publicly criticise such candidate's fitness for the position, is too plain to be disputed. The right to do so becomes a duty when, in the judgment of such elector, the unfitness of the candidate may be shown from his record. In the exercise of this privilege, the elector has the plain right to his own viewpoint, whereon he may stand with all the safeguards of free citizenship. This position is so palpably consonant with our institutions that to advance it would seem to be supererogation, were it not for the fact that it has been assiduously misrepresented, to the distress of many credulous souls all over the United States, that the Supreme Court of Ohio held to the contrary, and that judges were, in their view, immune from criticism.

The popular misinformation, as well as the absurd position in wh'ch stand many people who have discussed this case without knowing much about it, is typified by this extract from a deposition taken in this hearing; the deponent actually being a member of the bar of this state. In view of his naive admission of ignorance on the subject, this witness' lofty utterances furnish a touch of gaiety to this dreary case:

"We criticised them [judges, candidates for re-election] as freely as we did candidates for the Legislature, for mayoralty, or for the governorship, or the presidency. We did not then conceive that our right to do so as citizens was taken away by the fact that we were lawyers. No one ever imagined that such a doctrine would ever be laid down by any court until the Thatcher Case was decided by the Supreme Court of Ohio. I have not read the decision of the court in that case in full, but I am of the impression

that it lays down the rule that a citizen who becomes a lawyer thereby sacrifices some of the rights which he has as a citizen to criticise the judiciary and judicial candidates (sic). If it does, I want to go on record right here that I do not subscribe to or recognize the validity, the justice, the authority, or the policy of such a rule."

Of course, the premise of this witness has no foundation in fact. What the Supreme Court did decide was (syllabus, 80 Ohio St. 492, 89 N. E. 39):

"An elector who is an attorney has the right to criticise the judges and conduct of judges in a decent and respectful manner, but no man has a right to degrade and intimidate a public officer and bring his office into contempt by the publication of libelous matter at any time, and the fact that such officer is a candidate for re-election will not excuse such conduct."

And from the opinion (80 Ohio St. 673, 89 N. E. 90):

"Again we say that there is a broad distinction between fair and temperate criticism and abuse or slander of the courts or judges constituting them. Mr. Lincoln was not guilty of the latter offense, nor did Judge Taft approve it. And nobody knows better than a lawyer that, while judicious criticism is a necessary and effective means when used to keep judges mindful of their duties, and to prevent the selection of inefficient judges when judges are chosen by the people, yet when carried beyond the limit of truth and fairness nothing is more certain to destroy the judicial balance of timid judges and to effectually impair the impartial administration of justice."

The meat of the proposition, then, before us, is that two judges of the Supreme Court of Ohio joining in the foregoing enunciation of principles were still so little in mind that they would conceive themselves offended, to the destruction of their judicial balance, by the purely casual exhibit to them of this entirely unobjectionable bulletin of the labor organizations which formed an altogether immaterial part of the record.

In his answer in the state proceedings (80 Ohio St. 636, 89 N. E. 81) Mr. Thatcher said:

"That the defendant had nothing whatever to do with the preparation of that part of Exhibit C containing a report issued by the Ohio Federation of Labor and Brotherhood of Railroad Trainmen; that the same had been published and freely circulated throughout the state of Ohio a long time prior to October 24, 1908."

So far as the record discloses, this disclaimer was treated as a fact, and, as finally disposing of this matter, it is a fact that absolutely no charge against Thatcher was ever made at any time, formally or informally, directly or indirectly, because this bulletin was either incorporated in his circulars or circulated by him.

The argument which suggests the disqualification of these two judges might be offered with the same propriety against their sitting in a case where one of the parties was of another political faith; for instance, if the proprietor of some Democratic newspaper who opposed their re-election in the campaign of 1908 was before them as a party in litigation. It appears all the more impotent when we contrast the labor bulletin with the Thatcher Morris circulars as to wording and tone. These circulars occupy pages 561 to 614, inclusive, of the case reported in 80 Ohio St., and pages 59 to 75 of 89 N. E., and are too long to be reproduced here. If we are to assume that this temper-

ate criticism of the labor people founded a proper objection to the participation of such judges in a case to which the authors or publishers were parties, then we have opened a wide opportunity for disqualifying a whole bench. All a party need then do would be to exercise his plain right of critical comment of the several judges before whom the action in which he is a party might come, and, presto! he cannot be tried because of a disqualified bench. Somewhere we must indulge the presumption that those who are honored with judicial positions have some notion that they are to be reasonably impersonal in order to measure up to their official obligations.

The Supreme Court of Ohio said the Thatcher circulars were libelous of Judge Morris. In White v. Nicholls, 3 How. (44 U. S.) 266, 11 L. Ed. 591, the Supreme Court of the United States defined libel as follows:

"Every publication, either by writing, printing or pictures, which charges upon, or imputes to, any person that which renders him liable to punishment, or which is calculated to make him infamous, or odious, or ridiculous, is prima facie a libel, and implies malice in the author and publisher towards the person concerning whom such publication is made."

Tested by the application of this statement, which is but the ordinary definition of libel, these circulars were libelous, and shockingly so. If the language of almost any page is to be accepted as truthfully reflecting Judge Morris' judicial career, he was infamous, a disgrace to the bench.

At the solicitation of respondent, he was allowed nearly a half day on the stand to justify what his publications said of Morris, with an outcome that was simply pitiful. Making every allowance possible for bombast, political heat, and merely lurid rhetoric, there remained gross libel, for which nothing approaching an excuse was offered. A few examples may be given; for instance:

"Innocence Not Protected.

"Judges have great and exclusive power in divorce cases, which they are expected to use for the benefit of the defenseless children of unhappy marriages. Judge Morris has disregarded the sanctity of the home relation and exposed youthful innocents to improper surroundings."

An examination of the case upon which the respondent depended for this generalization disclosed facts readily accessible to the respondent, which showed that this was a cruel and entirely unjustifiable aspersion.

"The Law is Against the Unfortunate.

" 'The law is against the unfortunate' said Judge Morris in one case where he directed a verdict. Why is the law against the unfortunate? Because judges make it so. In Judge Morris' court the law is against the unfortunate only because Judge Morris considers and declares it against the unfortunate. What good is a law or a judge that does not protect the unfortunate."

Nothing that the respondent offered remotely justified such a statement as the foregoing, nor this:

"Man v. $$$$.

"Judge Morris has for 14 years held for the defendant in the case of Man v. $$$$$."

Under the caption, "A 4-Flush Bluff," the respondent questions the sincerity of Judge Morris' action in inflicting jail sentences in trust prosecutions before him, and is unable, in his attempt at exculpation, to offer any respectable reason therefor. The attitude taken by him when on the stand shows that this paragraph was born of pure malice.

One of the most flagrant instances, and, concluding with this, we are not by any means exhausting the libels contained in these documents, is that published under the heading of "The Deadly Parallel" (see pages 561, 562, and 602 of 80 Ohio St., pages 60 and 71 of 89 N. E.). As part of the context there appears this comment (page 562 of 80 Ohio St., page 60 of 89 N. E.):

"Trial by jury is a constitutional right of every free citizen. We ordinary Americans are proud of our jury system. Judges once respected that institution. Of late many have tried in various ways to undermine it. One plan is to take cases away from the jury and direct verdicts for the corporations and trusts. This has been a favorite practice of Judge Morris."

Seventy-one cases on the docket of the Lucas county court of common pleas are there referred to by number, and the whole context suggests very plainly that each of these cases was an action for personal injury against a corporation, and that in each Judge Morris had directed a verdict for the defendant and against the injured party.

We are confident that no one could read this portion of the circular without reaching a conclusion that the reference to these cases is made to justify the charge in the text which we have quoted. The facts, however, which were as easily ascertainable by the respondent as to get the numbers of the cases, are that but 28 of these cases were for personal injury (4 against municipal corporations, 11 against private corporations, and 13 against private individuals). Of the balance, 29 were on contract, and 14 were of various kinds—slander, malpractice, fraud and deceit, injuries by dogs, assault and battery, sale of liquor, and the like. In 5 of them the direction was actually for the plaintiff, and, of the 23 of them which went to the reviewing court, Judge Morris' judgment was affirmed in 19. When it is considered that Judge Morris was 14 years on the bench, the atrocity of the deduction, upon such support as this, that it was a favorite practice with him to take cases away from the jury and direct verdicts for corporations, is apparent.

When this part of the circular was under consideration, respondent attempted on the stand a scheme of justification. When he could no longer avoid direct answers, he admitted that it was always the clear duty of a court to determine whether a case had been made to go to a jury, and that the mere fact that a verdict had been directed raised no other presumption, in a lawyer, than that the court had properly performed that duty, and then proceeded with five reasons why he should not be criticised for this particular offense: (1) That he but followed the precedent set by the labor organizations. (2) That to have referred to the 71 cases more in detail than to simply give the numbers by which they were entered would have made his circular "too voluminous." (3) That he invited the voters to examine the records for themselves. (4) That some people were extravagantly laud-

ing Morris, the effect of which he thought he should counteract. (5) That the fact.that Morris was a candidate excused the quality of respondent's acts.

The utter inadequacy of these excuses for so gross a libel, a charge assumed to be supported by what is offered as record proof, that a judge, in the conduct of his office, habitually discriminated against the unfortunate, is no less apparent than the oblique moral vision disclosed in offering them. Take the third one, for instance. To invite voters to flock to the court records, instead of ameliorating the offense of libel, but aggravates it by emphasizing the false impression attempted to be conveyed that record proof did exist of the charge.

The distressing attitude of the respondent, who has not one word of regret for his conduct, appears in his statement:

"We asked the voters to verify what we said, and I now unequivocally say that every word that appears in that list is true, except that one typographical error."

Against such a state of mental and moral obtuseness reason appeals in vain. Every word true? It may be. But much less than all the truth is there, and his use of the partial truth in this context is designed to and does produce a wholly false impression. To have told just a little more truth about these cases—that but 11 of them were against the hated corporations, that but one-third of them were for personal injuries of all kinds, that in 5 of them the verdicts were for the plaintiffs, that 85 per cent. of those taken to the higher court resulted in the affirmance of Judge Morris' judgments, and that they covered a period of a dozen and more years' experience on the bench— would have been to have shown the baseness of the charge they were cited to support.

That this exploitation of half-truths in this connection and this utterance of so grave and baseless a charge was libel is so plain that the court must simply stand aghast at the position respondent still takes:

"I did not think I did, and I do not yet think I did, libel him. I agree with your honor that, if I did libel him, I had no right to do it; but I claim I did not do it. * * * There isn't a word of libel in this, to my knowledge, even now."

The Supreme Court was right in denouncing this circular as libelous. It is clearly such a libel as is made a crime under the law of Ohio. We would not say that an attorney guilty of libel should, under all circumstances, have his right to practice law questioned. If the offense had no relation to his profession, it might be ignored by the court in which he appeared. But this libel is one which distinctly relates to his profession, not because its object was a judge of the court in which he appeared only, but particularly because he uses his professional capacity to give point and effect to the charges which he makes. He is talking about things that the average layman can know nothing about. A charge that a judge is biased, unfair, the creature of certain interests, in the performance of his judicial duties, has point and acceptation, when made by a lawyer, much beyond that made by one not in the profession. His professional standing sharpens his weap-

ons. He is speaking from an elevation and with an authority peculiar to him.

Such conduct of the respondent in this behalf is surely unworthy of the profession of which he is a member. That it was exhibited toward a judge who was a candidate for re-election does not give it a character it would not have if displayed when no election were imminent. Libel is no less libel when published to affect an election.

Is it not easy to see that any assertion that a court is derelict in its duty to the whole people is bound to lessen in some degree that respect of the people for their courts which is essential to their usefulness and authority? A charge that a judge shows himself to be unfit for his exalted position involves in some measure loss of regard for the place he occupies. Undoubtedly, it is often necessary to make such a charge for the purpose of removing an unfaithful officer, and the risk that judicial authority might be weakened thereby must be taken; but no lawyer, it seems to us, who possesses sufficient appreciation of what it involves to be an officer of a court of justice to deserve the confidence of a court and be useful thereby to his clients would venture to deliberately deceive and mislead the public, as in this instance.

The right to criticise judicial candidates, whether upon their judicial record or not, is not involved in this situation. The right respondent is contending for is the right to employ his professional standing in deliberate libel, in order to work out personal feeling; and he claims the right, although to exercise it as he would involves a loss of respect for and a lowering of the proper influence of the very courts in which he undertakes to serve his clients. In our judgment, this conduct, and the indifference and unconcern still shown by respondent to its character, exhibit a fatal lack of appreciation of the functions and ethics of the office which he would hold at the bar.

We cannot sympathize with respondent's invocation of section 11, art. 1, of the Constitution of Ohio, which reads:

"Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of the right."

He has exercised his right to freely speak, write, and publish under this section. The question before the court is: Did he abuse the right? Under this section, by the recognized law, one libels at his peril, and there is where respondent stands.

[4] In argument, respondent and his counsel affect to consider this matter as involving contempt of court, and we are treated to much learning on the now popular notion that a tendency toward judicial tyranny in haling unfortunates to the bar for contempt must be curbed. The Supreme Court of Ohio did not consider the offense of this circular contempt of court, nor do we so regard it. Respondent's conduct meets no definition of contempt of court of which we have knowledge. It is treated purely as a circumstance indicating a want of professional character, a lack of fidelity to the obligations he took upon himself as a condition prerequisite to his admission.

We have also indulged respondent's counsel in the consideration of the advance sheets of the opinion of the Supreme Court of Ohio in the

case of Cleveland Printing Company v. Nethersole, 84 Ohio St. 118, 95 N. E. 735, and are unable to see wherein that case helps him here. The syllabus but states the settled law as to libel in this language:

"To constitute a publication libelous per se, it must appear that the publication reflects upon the character of such person, by bringing him into ridicule, hatred, or contempt, or affects him injuriously in his trade or profession."

And the holding is simply that the language used by the newspaper of the actress is not of that kind.

We might say that some of the language of the circulars was not obnoxious to that definition, but certainly we could not make such an observation of the passages which we quote, or of many others. The object of the circulars was to bring Judge Morris into ridicule, hatred and contempt; and when, in executing that purpose, respondent was guilty of untruth, or uttered half-truths to create false impressions, he was guilty of libel. That his office in circulating these documents was tainted by malice toward their object is very marked in the testimony.

[5] Specification 17, which forms one of the serious charges against respondent in the state court, and of which he was adjudged guilty, is presented in full on pages 544–549, inclusive, of 80 Ohio St., and page 55 of 89 N. E.

Briefly, it is that on February 1, 1908, respondent was the custodian of three promissory notes, two signed by Charles F. Milburn and George R. Hudson, made payable to one Albert Reiter, dated January 7 and January 18, 1896, respectively, for the sums of $1,101.24 and $1,276.84, respectively, and one dated November 25, 1895, for the sum of $2,500, payable to the First National Bank of South Bend, Ind., and executed by the Toledo Road Cart Company, by C. F. Milburn, Manager, and indorsed by G. R. Hudson and C. F. Milburn; that each of these notes had been fully paid and satisfied by Charles F. Milburn, and had been surrendered to Milburn to the respondent's knowledge; that on or about this date respondent, with intent to deceive the court, and to deceive Hudson, and to obtain a judgment on each of said notes against Hudson, and to procure for him (Thatcher) a large portion of the moneys to be realized therefrom, and with the fraudulent intent to conceal from Hudson the fact that each of said notes had been paid by Milburn, and the connection of him (Thatcher) therewith, delivered each of said notes to Alonzo G. Duer, Esq., an attorney at law, practicing his profession in Toledo, Ohio, and instructed Duer to forthwith commence in the court of common pleas of Lucas county, Ohio, a civil action in the name of Reiter against Milburn and Hudson upon each of said notes, and to cause service of summons to be forthwith made on Hudson; and that such action was accordingly commenced by Duer, who was ignorant that each of said three notes had been paid by Milburn. The petition contained three causes of action, each in the short form, with copy, permitted by the Ohio practice in actions by payee or indorsee of a promissory note, and demanded judgment for the full amount of the three notes, with interest in favor of Reiter as "owner and holder thereof."

The evidence sufficient for a full consideration of this charge is

found altogether in the admissions of the respondent and in the correspondence between him and Mr. Milburn. The action of the Supreme Court in condemning him has provoked Thatcher's repeated and heated protests in communications to law journals, interviews, and testimony. This court in this hearing has, at his instance, thrown wide open every avenue to a clear knowledge of the facts, and the attempt has been made to illuminate every dark corner, without regard to technical rules of evidence.

These are the facts: In March, 1900, Thatcher and Milburn, who was insolvent, met in Chicago and there entered into the relation of attorney and client; Thatcher engaging to make certain collections for Milburn. The latter informed Thatcher of the Reiter notes, and, protesting that Reiter should get something out of him (Hudson being likewise insolvent), proposed that Thatcher should attempt with Reiter to exchange for them four notes held by Milburn against one Murray, to which was attached as collateral stock in the Tubular Axle Company. At the same time, Thatcher was engaged by Milburn to obtain from the First National Bank of South Bend, Ind., the $2,500 note above referred to, in payment or exchange for which he had already given the bank several paid-up life insurance policies. Mr. Thatcher testified that he had explicit instructions to take up the latter note uncanceled, that Milburn's right of contribution against Hudson might be preserved. The exchange of notes in each instance was effected by Thatcher; Reiter taking the Murray notes, on which he afterwards obtained a small amount.

These two questions are vital touching this specification: Did the exchange of the several notes amount, *in the judgment of the parties dealing with them*, to a payment of each by Milburn, thereby clothing him with a right of contribution against his co-maker and co-indorser, Hudson? Was Thatcher's continued custody of them in his capacity as Milburn's attorney? It is fortunate for the court that the most significant testimony is in the form of correspondence, whose terms are unequivocal, and which is persuasive evidence, because written unaffected by the pressure of a tremendous issue.

March 9, 1900, respondent, writing for the firm to which he then belonged, stated to Mr. Milburn the terms upon which he is professionally engaged, namely: That two-thirds of all collections for Milburn up to $2,250 and all over that amount are to be respondent's fees.

May 17, 1900, respondent, for his firm, writes Mr. Milburn:

"We have succeeded in procuring the Reiter notes, giving in exchange the Murray notes and stock."

June 23, 1902, he reminds Milburn that he has the Reiter and South Bend bank notes, and, speaking of Reiter's financial situation, and that the latter has been unable to get much on the Murray collateral, suggests that, if Milburn would turn the notes over to Reiter, some satisfaction possibly might be had out of Hudson, concluding:

"Would like to have you and Mr. Knapp [Milburn's father-in-law] instruct me in this matter."

This letter is important, because it manifests a full knowledge of Reiter's inability to realize substantially on the Murray paper, which

Thatcher, as Milburn's attorney, induced him to "accept in settlement," as respondent phrased it in a subsequent letter, and because, in asking for instructions, he acknowledges Milburn's control of the notes and that his custody of them is under the latter.

To this epistle Milburn replied, asking that the notes be sent him, when he would try to meet Thatcher's wishes. Instead of complying with Milburn's request to return the notes, respondent, July 1st, writes reminding his client for the second time of the terms of the fee contract, two-thirds of the first $2,250 collected, and all above that amount to Thatcher, and proceeds with this important statement:

"I recently made a trip to Mishawaka to look into the affairs of our friend. I believe with considerable effort something can be realized on the Reiter notes and on the note given to the South Bend bank. More can be done if the notes are sued on in the name of Reiter and the bank. In order to get Reiter and the bank to allow suits to be brought in their names, they will no doubt require a portion of the amount recovered to be paid to them. I am willing to give a portion of the amount to which I am entitled, provided you are also willing to do the same. I consider our agreement of March 9th still in force, but desire your co-operation as to the manner in which it shall be carried out."

It is conceded that "our friend" refers to Hudson. Aside from this first suggestion that suits be brought in the names of strangers to the paper in its then condition, and that these persons receive compensation for the use of their names, this letter is important for the fact that in it respondent includes these three notes in the business he has for Milburn under the fee contract, which the latter is not permitted to forget.

Milburn not answering this communication, Thatcher, October 18th, wrote again practically on the same lines. We quote it in full that the voice of respondent may be heard without editing:

"On July 1st I wrote you concerning the Reiter notes and also the note given to the South Bend bank. I stated that I thought there was a chance of collecting from Hudson, but that it would be better to make arrangements to bring suit in the name of the bank and Reiter. I also stated that I was willing to pay a portion of my compensation to Reiter and the bank in consideration for the use of their names. I do not suppose that the bank will require this, as its president expressed great regard for you, and seemed anxious to do all that he could to aid you. I do feel that Reiter should have some compensation, as I assured him a long time ago that you had written me to the effect that you would make payments to him as soon as you were able to, regardless of the fact that he had taken the Murray notes in exchange. My suggestion is that suits be brought in Indiana in the name of Reiter and the bank without further delay. I am on the track of evidence that should be valuable."

A week later Milburn answered both letters by simply inquiring how much Thatcher thought he could get by his plan, closing the letter:

"Give me the amount as nearly as you can, and I will then answer you promptly."

Thatcher answered to this that in his judgment it was possible to collect the face of the claim and possibly more. There appears to be no reply to this from Milburn.

November 13th, respondent deems it time to remind his client by letter, for the third time, of the terms of the fee contract, quoting it in

full, and concludes by making very plain the status of the Reiter notes in his hands, as follows:

"In this you will notice that the Reiter notes have been included with other claims, which you may have placed in our hands."

Two letters are then exchanged, December 2d and December 20th, which need not be quoted, as they are preliminary only to a request from Milburn that Thatcher draw up papers for him to sign, transferring to Reiter the right to sue the notes. In reply, February 7, 1903, Thatcher writes:

"Inclosed find draft of agreement suggested in the Reiter matter. Mr. Reiter called a few days ago to learn whether there was a prospect of his getting anything more on his notes. I asked him if he would allow the use of his name, providing he got 15 or 20 per cent. of the amount realized. He seemed willing to do this, although it seemed hard for me to make him thoroughly understand what I desired to know, but I trust he did understand me. I think it will be much better to have the suit brought on the First National Bank note in the name of the bank if you can make satisfactory arrangements.

"Regarding your personal claim against Hudson, will say that he has bought a number of claims against both of you, so that I am unable to determine how your account with him stands. Let us have the Reiter matter disposed of at an early date."

The last paragraph is worthy of note, in connection with a line of argument employed by Thatcher in his letter of February 14th, below. No copy of the agreement tendered in this letter appears in evidence.

February 13th Milburn writes:

"I inclose herewith an assignment for the Reiter notes. The First National Bank of South Bend would not bring suit. Consequently I make no assignment."

The inclosed assignment is in these words, omitting for brevity that part which describes the two notes, the only notes affected thereby:

"Whereas, C. F. Milburn has paid Albert Reiter in full for two notes as described below; and whereas, said two notes were jointly signed by C. F. Milburn and George R. Hudson: For a consideration C. F. Milburn assigns to said Reiter the right to sue George R. Hudson as a signer of the notes, and hereby assigns to him any amount that he may collect on same, to be his entirely, under the following conditions: Said Milburn is to be held harmless by said Reiter for any expenses whatever arising out of said suit including attorney's fees."

We embody in full respondent's answer under date of February 14th, which, in our opinion, is one of the most significant documents in the entire correspondence:

"Yours of the 13th, containing an assignment of notes to Albert Reiter, received. The assignment recites the fact that you have paid Reiter in full for the two notes and assign your right to sue Hudson as a signer of the notes and assign anything he may collect. I fear this will cause complications, so that it would be claimed by Hudson that. if you have paid Reiter for the notes, his [Reiter's] interest in them has ceased. Hudson will then claim that anything to which you are entitled is offset by claims which he has against you, and therefore your assignment to Reiter of the right to sue on the notes will allow Hudson to bring in his set-offs. In other words, Hudson will have the same defense against Reiter that he would have if you brought the suit. Would not a better way be for you to sign a statement

to the effect that, whereas, you have made an exchange of certain notes given to you by one Murray for the notes held by Reiter, and at the time of exchange it was represented to Reiter that a considerable sum could be collected on said notes, but that it had afterwards been found that such was a mistake, and it being the desire of both parties to cancel such agreement of exchange, you therefore do by the instrument named reconvey to said Reiter all rights which you acquired by reason of such transfer, and he in turn conveys to you the Murray notes? It is possible that I will go through your city in about a week or ten days, and will wire you if I do so. My trip is not definitely planned."

Milburn promptly and briefly replied that he was not willing to sign such a paper as that indicated by respondent, or "to sign any paper that will make me liable again for notes that I have paid him for," but will sign any paper that would protect both him and Reiter, and the matter then rested for nearly two months, to be revived by a letter of Thatcher of April 4th, explaining his view that Reiter could not sue on the notes against a maker and accept an assignment to the effect that he had been paid, and including this paragraph, which we quote, in the view that, because it was not worded when a pregnant issue was pending, it is more weighty evidence of respondent's view of the situation than subsequent explanations:

"You wrote me some time ago to assure Mr. Reiter that you would pay the amount due him when able to do so, even if he did *accept the Murray notes in settlement*. If this is your intention, you ought not to hesitate in placing the thing in such shape as to make it possible for Reiter to realize something."

In reply, Milburn bluntly said:

"Draw up a transfer from me to some one else, assigning my claim against Hudson on these notes and protecting me, send to me to sign and return to you, and then let that party sue in his name for Reiter. Send me with this paper one signed by the party releasing me from any liability. I will sign no paper creating any new liability on my part."

Nothing further was done until September 21, 1903, when Thatcher wrote Milburn, inclosing a draft of a new agreement, to which Milburn promptly replied, emphatically refusing to sign the paper, saying, among other things:

"I should like very much indeed to know that Albert Reiter had been paid in full and would be willing to sign a paper assigning these claims to him, *if the assignment could and would be worded in such a way that I would not be again held liable to Reiter or any one else in case of failure to be satisfied with whatever was collected from Hudson*." (Underscoring Milburn's.)

Except for one exchange of letters in November, which is not significant, the correspondence lagged until February 27, 1904, when Thatcher wrote Milburn, inclosing a new assignment to be signed, transferring the notes to Reiter, and a form of receipt for the notes to be given in return for the assignment. Milburn's reply to this was to say that a friend would call on Thatcher for a conference, and four subsequent letters passing between the parties make very plain that this last proposed form of assignment was unacceptable to Milburn. The correspondence comes to an end with this letter from Thatcher, September 9, 1904:

Your letter of August 12th came during my absence from the city. I think it best that you have your own attorney draft such papers as are necessary to be signed by Mr. Knapp transferring the Hudson notes to Mr. Reiter. In fact, I think the notes are already indorsed without recourse and can be transferred by delivery. If you will consent to my proceeding in Reiter's name, will do so and not ask for any papers at all. Would like to make some progress in this matter."

And Milburn's reply, dated September 12, 1904:

"Answering your favor of the 9th, will say that if **a way** can be devised for going to work on this matter which will absolutely hold Mr. Knapp and myself harmless, all right. We will then sign papers authorizing you to go on. If this cannot be done, the matter will have to be dropped."

We are unable to read this correspondence and arrive at any other conclusion than that both parties considered all along the ownership of these three notes to be in Milburn, and that Thatcher's custody was that of an attorney for him. With the full knowledge of a participant, Thatcher assumes all along that the "exchange" with Reiter extinguished the latter's interest in the two Milburn-Hudson notes. If none of the many other expressions in that behalf concludes him, certainly the letter of November 13, 1902, accomplishes that result, wherein, after quoting again the terms of the fee contract of 1900, he says:

"In this you will notice that the Reiter notes have been included with other claims which you may have placed in our hands."

This language also is conclusive that respondent was holding the notes as Milburn's attorney. The effect of this correspondence also is unquestionably to leave the notes at the conclusion in exactly the same status as they were all along. They were not assigned to Reiter, for Milburn's well-meant attempt of February 13, 1903, Thatcher did not accept, because in his judgment, as he baldly says in his reply of February 14th, it would not deceive anybody; it might cause "complications"; and thenceforth they were not able to agree upon a form of assignment which could be relied upon to impose on Hudson.

We agree, also, with the committee that the effect of the last two letters—Thatcher's request and Milburn's denial—amounts to a prohibition on the part of Milburn to his attorney (Thatcher) to proceed on these notes as matters then stood.

Nothing further took place for two years. The notes remained with Thatcher in precisely the same capacity. No new facts intervened. Then, without the slightest authority which respondent is able to show this court, unless it can be gathered from the foregoing correspondence—which is a proposition too abstruse to be readily grasped—Mr. Thatcher entered into this contract of December 6, 1906, with Reiter:

"Albert Reiter hereby employs C. A. Thatcher, who undertakes to collect from George R. Hudson and James Murray all that can be recovered on certain notes executed by said Hudson and said Murray and now owned by the said Reiter. Said Reiter agrees to pay to said Thatcher one-fourth of whatever sum may be realized on said notes, either by suit or settlement, and assigns to said Thatcher an interest in the subject-matter of said claim and notes as collateral security for any fees to which he may be entitled. It is understood that said Thatcher will make no charge for services rendered un-

less something is recovered, and will use diligent efforts in the prosecution of said claims."

It is conceded by respondent, who offers this contract, that the notes referred to therein as executed by "said Hudson" are the Milburn-Hudson notes which are the subject of the above correspondence. We agree with the committee that respondent is ungrateful in his complaint that the Supreme Court did not take this contract into account, and that it was a mercy to the respondent that that court did not notice it. We are forbidden by the respondent himself to be equally merciful, for he literally thrusts it upon us. To hold these notes as Milburn's, under the contract of 1900, that he should have at least two-thirds of the proceeds of collection, and at the same time contract to collect them as the property of another client, is a piece of professional acrobatism too unseemly to be considered patiently.

The rest of this sorry story is soon told. February 1, 1908, just before noon on a Saturday, the court offices closing for the afternoon, respondent took not only the Milburn-Hudson notes, but also the South Bend bank note, in which Reiter never did have any interest, and which at no time Milburn attempted to assign, to an attorney who was ignorant of all the circumstances, and procured him to sue the notes as though they were the property of an owner and unpaid. This is the act with which this specification deals, and it is precisely what respondent, from June, 1902, to September, 1904, tried in vain to induce Milburn to agree to.

The letters of July 1, 1902, and February 14, 1903, from Thatcher to Milburn, involve a distinctly immoral proposition. The notes are to be sued, as Thatcher proposes, in the name of a person who has no interest in them, and who is to sell the use of his name and to assume an apparent interest for the purpose of imposing upon Hudson. There is no need to multiply words in characterizing respondent's attitude shown therein. It was immoral and unprofessional, confessedly involving imposition and deceit. The manner in which the suit was brought but carried out the deceitful plan respondent proposed, and which Milburn rejected.

Shortly after his disbarment, Thatcher wrote a letter to the Ohio Law Bulletin in his defense, and there attempted to place himself, with respect to this transaction, in more favorable light. He has urged that communication upon this court as embodying his answer to his critics. He says:

"In the hearing at Columbus I offered to show that the original transfer of the Murray notes to Reiter was a fraud perpetrated by Milburn on Reiter, in that the Murray notes were past due and wholly without consideration between Murray and Milburn, though this was not known by me at the time of the transfer. This evidence was rejected by the court. My contention is that with this evidence in it clearly appears that Reiter parted with his notes without consideration and had the right to ignore the exchange for the Murray notes and bring his suit as he did bring it."

We find in the record before us, and in respondent's own statements, matters which provoke at least a guarded question of the veracity of his claim that he did not know at the time "that the original

transfer of the Murray notes to Reiter was a fraud perpetrated by Milburn on Reiter, in that the Murray notes were past due and wholly without consideration," and which also raise a suspicion that respondent is at least disingenuous in assuming now an attitude of virtuous indignation at Milburn for using him as a tool in the perpetration of a fraud, under influence of which commendable feeling he made the contract with Reiter of December 6, 1906. These matters are: First. That having the Murray notes in his possession, as Milburn's attorney, for the purpose of trade with Reiter, he must at least have known that they were past due. Second. From a letter from Thatcher to Milburn, dated March 14, 1900, this appears:

"Have seen Mr. Reiter, but have not been able to get him to accept the Murray paper. * * * Murray had told him that he would not pay a dollar on the notes, and he seems to be afraid to touch the Murray notes."

It seems hardly possible that this does not involve information then to both Thatcher and Reiter that these notes were accommodation paper. Third. That, in urging the Murray notes upon Reiter, respondent dwelt specially upon the collateral as being of some value, according to his own testimony. Fourth. Three years before the correspondence closed, and five years before his contract with Reiter, respondent had made the first and only collection on this paper for Reiter, and knew exactly how bad a bargain he had persuaded Reiter into. Fifth. In his letter of February 14, 1903, planning the imposition he had in mind for Hudson, he uses language which indicates a complete knowledge of all the circumstances of the transaction in which he acted for Milburn. Finally, and as conclusive in our mind that the wrongs of Reiter and his own alleged unconscious part in the perpetration of a fraud were not embittering him against his unworthy client, it appears that when he took these notes to Duer to be sued he said to the latter:

"We don't want to hold Milburn; he is helping us."

If he were then acting in repudiation of a base fraud, and treating that transaction as if it never had been, it does not seem likely that he would have been so considerate of Milburn, the author of the fraud and his own betrayer. It is a fair, almost necessary, presumption, at any rate, from the record, that respondent knew as much of this transaction when he was treating these notes as clearly Milburn's, in 1904, as he did two years afterwards, when he made the fee contract with Reiter. But, giving him the benefit of the doubt, when suspicion came to him that he had been used to defraud Reiter, his professional duty toward his client, Milburn, was to give the latter a chance to be heard before he rendered judgment that the notes were Reiter's. Again, assuming that this may be received in defense of his action with the Reiter-Hudson-Milburn notes, it has no office touching the South Bend bank note, in which Reiter never had an interest, and as to which Milburn's holding, in Thatcher's professional custody was without a flaw. No excuse is offered for suing that in Reiter's name.

190 F.—63

Again, in this letter, Thatcher says:

"No one claims that he [Reiter] did not have the right to sue for contribution. If I mistook the remedy, I fear that many other lawyers in Ohio have made like mistakes in their professional lives, and are now liable to account for the same."

If Reiter had never parted with his title to the Milburn-Hudson notes, then, of course, his right to sue was not the right of contribution. If he had a right of contribution, it must have been through some assignment from some one who had paid the notes, namely, Milburn, and the last word had from Milburn was his refusal to assign generally to Reiter.

It is remarkable hardihood for respondent to now plead that Reiter had the right of contribution in face of the record he made for himself in the above correspondence in trying, for more than two years, to avoid that very thing. That is exactly what he refused to permit Milburn to convey to Reiter. It is also remarkable against the fact that the suit was not brought in the form of an action for contribution. Again, whatever may have been Reiter's right to sue for contribution on the Milburn-Hudson notes (and we are unable to find any in this record), he clearly had no such interest in the South Bend bank note.

The two excuses are inconsistent with each other, and neither can be reconciled with the record. It is unfortunately true that the more respondent attempts to explain the more deeply do the facts involve him. As in the letter from the respondent to the Law Bulletin, from which we quote, and as in many statements he has made to the court, and elsewhere, publicly or privately, he may take up one phase of the matter, handle a few of the incidents, and construct a plausible story of self-exoneration; but the whole record, patiently and honestly analyzed, presents a sordid attempt to plant a suit on a fictitious basis, with a view to deluding the defendant (Hudson) into a different defense than he would be entitled to in an action brought on a true state of facts, and respondent's purpose is so persistent that, unable to gain his client's consent, he calmly repudiates his professional obligations to Milburn and finds virtue in the act.

In face of the record he made himself, it is puerile for respondent to hint that he is being punished because possibly he "mistook the remedy." He made no mistake. Mr. Duer planted the suit exactly in the manner occupying Thatcher's mind when he wrote the letters of July 1, 1902, and February 14, 1903.

Respondent again finds credit for himself in the fact that his contract with Reiter called for a fee of but 25 per cent.; whereas, he was to have a much larger share in the arrangement he was seeking to make with Milburn. The amount which Thatcher, in his letter to Milburn, thought would be sufficient to buy the use of Reiter's name, was 10 per cent. In the contract which he proposed and sent for Milburn's signature September 21, 1903, when he had full knowledge of how badly Reiter fared with the Murray notes, occurs this passage:

"It being understood, out of any collection made on said notes, the said Reiter shall retain ten per cent. (10%), and shall pay to me forty-five per

cent. (45%), and to C. A. Thatcher forty-five per cent. (45%). Should the
45% to which I may be entitled amount to the sum of $2,250.00, then said
Reiter shall pay to said Thatcher all over the sum of $2,250.00."

Milburn refused to sign this for reasons already given, but directed
that, when a satisfactory form of assignment was reached, it should
transfer to Reiter his (Milburn's) 45 per cent. At no time did re-
spondent, when treating these notes as Milburn's, provide a larger com-
pensation to Reiter than 10 per cent. It is difficult to see any virtue
in the fact that when respondent found himself unable to prosecute
this business on a basis of 45 per cent. and all over $2,250 when 45
per cent. reached that sum, he lowered his terms to 25 per cent. net.
The circumstances rather indicate the persistence with which respond-
ent pursued his intention to make something for himself, whatever
the means required to carry that purpose into effect. He was dealing
with paper which he certainly held as attorney for Milburn. To treat
it, without notice to his client, as the property of a stranger, was with-
out the slightest professional excuse. That in the ravishing of his
client's interests he made better terms for the stranger than were origi-
nally in his mind does not relieve the viciousness of the transaction.
The professional wrong conduct of which respondent stands convicted
was conceived by him in 1902. The conception was fully set out in
the letter of February 14, 1903, and found its logical and consistent
execution in the planting of the suit. How much it cost in promises
to buy Reiter into the consummation is not important. Besides, it is
quite apparent that 25 per cent. of recovery in an action upon the
notes as unpaid and in original payee's hands involved more money to
respondent than to have sued upon a right of contribution in favor of
Milburn.

The action brought by Duer is still pending on an amended petition
signed and filed by an attorney in Mr. Thatcher's employ, and the is-
sue is raised by reply to Hudson's answer (Milburn not being served)
that the exchange with Reiter was fraudulent. While the case at bar
was on hearing, this case of Reiter v. Hudson and Milburn was tried
to a jury in the state common pleas court, with a verdict for Reiter on
the Hudson-Milburn notes; the cause of action on the South Bend
bank note being withdrawn. Thatcher was not a witness before the
jury in this case, nor did that court have the enlightenment all this
correspondence has furnished the Supreme Court, as well as this court.
Nevertheless, this verdict has been offered to us as controlling the
question of fact, and has been used as another text for violent attacks
upon the Supreme Court. As it appeals to us, it is entirely imma-
terial whether or not Reiter was induced by fraud to part with the
Hudson-Milburn notes. Respondent's conduct is to be tested by the
view he is seen to be taking of that transaction. However that may
be, on a motion for new trial, Judge Wannamaker, who tried the case,
has set the verdict aside for want of evidence sufficient to support the
claim of fraud.

We note here a bit of record which illustrates respondent's profes-
sional sinuosities and illuminates the character of his moral percep-
tions. Endeavoring to explain why he brought the action in the name

of another attorney, he testified that at the time he expected Hudson to permit a default judgment, with the main contest to be in collecting it, and that he had social relations with Hudson and his family which he feared the suit would interrupt if he appeared in it. Of course, it is an interesting sidelight, set aflame by this excuse, that he was willing under cover to impose a deceitful action on his friend. But we have reference especially to another matter. The record of this case as far as it had gone (to the verdict) was admitted in this hearing, upon respondent's insistence, although it seemed of doubtful materiality. In it appears the fact that, after an answer had been filed, and the hopeful expectation that no resistance would be offered by Hudson was at an end, respondent filed an affidavit of prejudice in the case, although not yet attorney of record, and never thereafter appearing as attorney of record, in which he swore that he was "one of counsel for the plaintiff in said case; * * * that the said judge has a bias and prejudice against affiant"—the judge referred to being Judge Morris.

Two reflections occur right here: First. That this was an unnecessary and uncalled-for attack upon Judge Morris, who but for the affidavit might not have known of respondent's secret professional interest in the case. Second. That friendship for Hudson, which he claimed was strong enough to impel him to hide behind Duer, that the friend might be deceived, was not equal to the strain imposed by the fact that his friend was offering a defense which respondent as a lawyer, with full knowledge of all the facts shown by the correspondence just considered, knew he was entitled to. On the whole, we incline to the opinion that this circumstance suggests that his excuse for suing Hudson through another law office was disingenuous, and that his real object was to aid the deception upon Hudson which he proposed in his letters to Milburn, and that, when he found this line unavailing to delude Hudson, his cupidity, which involved him in the fee contract with Reiter touching Milburn's paper, got the better of him and brought him into the open in the case. It appears to us as but another fact tending to prove that the action against Hudson in the form in which it was brought was not in good faith. Shortly after the filing of this affidavit he was disbarred from practice in the state court, and the subsequent amended petition was filed in the name of an employé of his office as attorney.

In fairness to the respondent, we ought not to finish the consideration of this matter without discussing the reason advanced by him to us for treating this paper as Reiter's after having so long held it as Milburn's. It is that he thought he might read Milburn's letter of September 12, 1904—the last word Milburn wrote, and which Thatcher never answered—in the light of Milburn's attempt to assign his right of contribution on February 13, 1903, which Thatcher rejected because, as stated in his reply of February 14th, it "might cause complications" in not giving a chance to deceive Hudson, and regard the two as affecting a relinquishment by Milburn of all his rights to these notes. That position, however, is hardly plausible even, first, because Milburn never had or claimed any rights in the notes save a

right of contribution, and in suing Hudson the action was not upon a right of contribution at all, all the correspondence showing that Thatcher never intended to sue on such a foundation; and, second, because Milburn in that last letter expressly cautioned Thatcher that nothing should be done, except that "which will absolutely hold Mr. Knapp and myself harmless," otherwise "the matter will have to be dropped," whereas the suit which was begun, and begun, too, precisely in the way in which Thatcher for six years persistently intended it should be begun, was framed in the one way in which Milburn would not have been held harmless, for a judgment as therein aimed at would have put him at the peril of a right of contribution in Hudson. It seems to us that in taking such a position, if respondent did in fact take it at the time the action was begun, he violated the plainest purport and caution of this last letter from his client, Milburn. Besides, what has this to do with treating the South Bend bank note as Reiter's? It was not included in the rejected assignment of February 12. 1903, and Reiter never had a color of right to sue it, even on respondent's construction of the correspondence.

Specification 14, of which the Supreme Court of Ohio found respondent guilty, is founded upon the admitted fact that on October 5, 1906, respondent caused to be prepared and delivered to the clerk of the Lucas county court of common pleas 11 affidavits of prejudice against Judge Morris, in which, as to their respective cases in which he was attorney, Thatcher stated under oath that Morris entertained a bias and prejudice against him. It is alleged that, having delivered these documents to the clerk, respondent requested the latter to inform Judge Morris that if he would transfer the cases to another judge the affidavits would not be filed, and that by this action the respondent undertook to intimidate and improperly influence Morris as a judge, and to obstruct justice, etc. Touching this specification, the Supreme Court said (page 663 of 80 Ohio St., page 87 of 89 N. E.):

"The facts stated in specification 14, standing alone, would probably not be regarded as sufficient to sustain the charges; but the respondent's own testimony, in the opinion of a majority of the court adds materially to the gravity of the situation."

Evidence before us warranted, in our judgment, a feeling in respondent at that time that Judge Morris was not personally friendly to him. Wherefore, considering the state practice regarding affidavits of prejudice, we feel that he should have the benefit of the doubt. At any rate, without in any way questioning the judgment of the state court respecting qualifications for its bar, we do not consider that the matter demands attention at our hands adversely to the respondent.

[6] Three charges of misconduct, charges Nos. 2, 3, and 4, are made in this case against respondent which were not before the state court. Charge 2, in effect, is that a case in this court, entitled Rucki v. Pennsylvania Company, having been tried to a jury, Knappen, Judge, respondent prepared and submitted a bill of exceptions to Marshall & Fraser, counsel for the railroad, for their approval before submission to the judge for signing and sealing, and that, after Marshall & Fraser had amended the bill and had approved it, respondent, will-

fully and with intent to deceive said attorneys and the trial judge, caused to be inserted in said bill a certain paper (Exhibit K in this hearing), to which said attorneys had objected, and thereupon imposed the bill as so added to upon the trial judge, who, without knowledge of respondent's act, signed the same as if it had been approved by all counsel.

The court, in considering this charge, is saved the necessity of passing fully upon an issue of veracity raised by the oral testimony of Fraser, who is the only witness for the committee, and respondent, because correspondence between Thatcher and Marshall & Fraser, and between both parties and Judge Knappen, introduced in evidence, and the admissions of respondent himself combine to an unmistakable conclusion.

The verdict in the case in question in its amount disappointed Mr. Thatcher, who represented the plaintiff. Wherefore he undertook to prosecute error. June 10, 1908, he submitted the bill of exceptions to Marshall & Fraser, who returned it immediately unapproved and unexamined, because of an inability to meet his request that they examine and return it by that evening. The fact that they had not approved or examined it was stated in a letter from them to Thatcher, a copy being sent to Judge Knappen, together with their protest against inclusion in the bill of matter referring to the motion for new trial and the affidavits in support thereof. Judge Knappen, June 13th, returned the bill to Thatcher without his approval, saying to respondent, among other things:

"It also contains the proceedings on the motion for new trial, the denial of which is not a proper matter of exception, nor can it be reviewed by writ of error in the federal courts. * * * The matters which I think should be eliminated are these. * * * (4) The proceedings upon motion for new trial and the affidavits in connection therewith."

It is respondent's persistence in keeping in the bill this matter touching the motion for new trial that got him into the difficulties out of which this charge arises. June 24th he sent the bill to Marshall & Fraser for the second time. On the 29th they returned it, accompanied by a letter in which they said:

"And we also object to the reference to the action of the trial court upon the motion for a new trial, and object to any reference to the evidence and affidavits on that hearing."

On the same day they wrote to Judge Knappen to the same effect. July 1st Thatcher sent the bill to opposite counsel for a third examination, with a letter; the part important for this consideration reading as follows:

"On the question of the affidavits, I cannot agree with you that they should not be in the bill, as I do not know of any other manner in which the substance of these affidavits can get into the record, unless it is agreed that the substance of these affidavits is correct. With that in view, I hand you herewith a condensed statement of the substance of these affidavits, and would suggest that you have it inserted directly after the charge of the court. If you consent to this, all of the affidavits may then be separated from the bill of exceptions."

The testimony is that this letter and bill were transmitted by messenger, and with these, in a separate envelope, was the "condensed statement of the substance of these affidavits," which figures in this case as Exhibit K.

On the same day Marshall & Fraser returned the bill, with a letter which we copy here in full, as showing the emphasis with which they repeat their objections to the inclusion of the matter which Judge Knappen, three weeks before, had directed 'respondent to omit. The letter from Marshall & Fraser to Thatcher reads:

"We have your favor of the 1st inst., again handing us the bill of exceptions in the case of Rucki against the Pennsylvania Company. We note that you have made all the changes we ask, except omitting reference to the hearing upon the motion for a new trial, and the reference to the affidavits.

"We are satisfied with the bill as you now have it, except that portion referring to the hearing of the motion for a new trial and the attaching to the bill of exceptions of the affidavits or the substance thereof.

"Our position is that there is no proper place in a bill of exceptions, in the federal court, for any reference to a motion for a new trial or any evidence used thereon, either oral or in the form of affidavits. We must therefore object to these affidavits or the substance thereof being attached to this bill of exceptions. In forwarding the bill to Judge Knappen, you may send him this letter, if you will."

July 2d the bill was sent to Marshall & Fraser for the fourth time, accompanied by this letter from Thatcher:

"I have removed the affidavits on motion for new trial in Rucki case from bill of exceptions, and think it now entirely accords with your views. If it does, will you please O. K. the same, and I will at once transmit it to Judge Knappen."

It then contained, on the last page, and immediately above the judge's certificate, this:

"Thereupon and within due time, the plaintiff filed his written motion to set aside said verdict and for a new trial, for the reasons set forth in said motion, and upon the hearing of said motion, and in support thereof, read to the court the affidavits hereto attached, of the following named persons [naming them]. The court thereafter overruled said motion of the plaintiff for a new trial, to which action of the court the plaintiff duly excepted."

This paragraph Mr. Fraser eliminated by cross-hatching, and, having satisfied himself that the bill conformed to his views, indorsed the "O. K." of his firm, and returned it to the respondent, who, July 6th, sent it to Judge Knappen with a letter of about 200 words, saying, among other things:

"You will notice that the bill has been completely rewritten, and approved by counsel for the defendant."

July 10th the judge signed it, and, in returning it, wrote to Thatcher, sending a copy to Marshall & Fraser, as follows:

"I have signed the bill of exceptions as prepared by you and as approved by Messrs. Marshall & Fraser, making, however, one slight correction upon the sheet inserted between pages 23 and 24. It does not occur to me that the matter on that page [which relates to the hearing of motion for new trial] is properly part of the bill of exceptions; but as Messrs. Marshall & Fraser have O.K.'d the bill, I will let it stand, with the addition which I have made."

The sheet referred to by the judge as being between pages 23 and 24 was Exhibit K, the "condensed statement of the substance" sent to

Marshall & Fraser July 1st by respondent with the letter quoted above, in which it is offered as an alternative to the affidavits, and which he suggests they have "inserted directly after the charge of the court." It is the same proposition which defendant's counsel rejected in their reply of that date, which we again quote in part:

"We must, therefore, object to these affidavits *or the substance thereof* being attached to this bill of exceptions."

It is for the alleged wrongful insertion of this sheet (Exhibit K) after approval of the bill by opposing counsel that respondent is facing this charge. When the bill reached and was signed by Judge Knappen, this sheet was permanently bound between the copy of plaintiff's refused requests to charge, which ended page 23, and the court's charge, which headed page 24.

Immediately after the receipt of Judge Knappen's letter apprising them of the condition of the bill, Marshall & Fraser voiced their objection, vehemently protesting that it was not approved by them in that form. It is apparent, then, that the issue is whether Exhibit K was before them as a proposed part of the bill when they indorsed the latter as satisfactory.

On the hearing, Fraser testified positively that when the bill was examined and approved by him there was no sign of Exhibit K; that, had it been there, it could not have escaped him. Thatcher, with equal positiveness, asserts that the sheet was sent to Fraser inserted loosely in the bill, and that it came back in that position. In this he is supported by his clerk, Gamble, whose apparent honesty and purpose to tell the facts as they were in his mind impressed the court. His loyalty to his employer was manifest. He was, in 1908, about 20 years old, and had been general utility boy, clerk, and stenographer for respondent for about two years, and at the hearing was still in that position. A close cross-examination developed a justification for the feeling that he might easily be honestly in the mental error, not at all uncommon with upright witnesses, who, when their partisan feelings are aroused, testify to things as having actually occurred because they believe that, in the usual course of matters, they must have happened. He said that his duties concerning the bill were purely routine. He gave no reason at all why this one fact, purely casual at the time, should have been so impressed upon him, while other details (he carried the bill to Fraser four times) should be so hazy in his memory, and finally said that matters touching the bill made no "extraordinary impression. nothing more than the rest of the office duties." His testimony now, three years afterward, is much more in respondent's favor, goes more into detail at vital points, than that of his affidavit prepared in 1908 for Judge Knappen's information, although that affidavit was dictated by respondent himself to meet Marshall & Fraser's motion to eliminate this sheet. There is an atmosphere about Gamble's testimony which makes easily possible a disregard of it without at all reflecting upon him.

On the whole, as the record stands at this point, it is very easy to decide the issue against respondent on the preponderance of the evidence. It is very improbable that Fraser, who from the very first,

and in two letters to Thatcher and two to Judge Knappen, had so strongly objected to anything of this kind, would have so suddenly and inexplicably yielded had he known of Exhibit K's presence in the bill. We have seen that only the day before, in the aptest and strongest language, he had rejected this very paper as a proper part of it, and had definitely refused to approve the bill when burdened by it.

It is equally improbable that, had the sheet been in the bill when delivered to Fraser July 2d, he would have overlooked it. According to Thatcher and Gambie, the bill on that day was bound together at the top by tape passed through holes about three-fourths of an inch from the top of the sheets, and Exhibit K was loosely placed between two of the leaves, in their opinion being fastened only by a clip. Under these circumstances the clip would advertise its presence almost on a casual handling of the document, and in addition the sheet would protrude nearly an inch beyond the other sheets at the loose end and literally obtrude itself upon the attention. We think, therefore, it is inconceivable that Mr. Fraser, who surely examined the bill, for he struck out the reference to the motion for new trial just before the certificate, should not have seen it at the time, if it were actually there.

Marshall & Fraser's prompt repudiation of this sheet as part of the bill they approved as soon as they learned of its incorporation is to be considered. Such conduct entirely harmonizes with their position prior to July 2d, and becomes wholly incomprehensible if, in fact, on that day they receded from that position.

Two words from the respondent himself incline the preponderance strongly against him. First is the letter of July 2d transmitting the bill to Marshall & Fraser for the fourth time. We cannot believe that, by the time he wrote this, Thatcher should not have comprehended Fraser's "views" involved elimination from the bill of all possible reference to anything pertaining to the motion for new trial. But the day before respondent had written to Marshall & Fraser that he handed them "a condensed statement of the substance of the affidavits," which "statement," all agree, was this Exhibit K, and which he suggested could be used as an alternative to the affidavits, and on the same day came back in reply, in each of three paragraphs of the letter which we have above reproduced in full, that all reference to the hearing of the motion for new trial was objected to. The language of this letter was unmistakable. They object, to quote it, to the "affidavits or the substance thereof." To assume that Thatcher wrote his last letter, on the next day, "and think that it now *entirely accords with your views*," believing that to include Exhibit K would harmonize with Fraser's oft-taken position, is to reflect on the former's intelligence. To assume that he wrote these words and at the same time intended to make this sheet a part of the bill is to reflect upon his honesty, for then the statement would be false. There is no escape from one hypothesis or the other. The letter was written to express, honestly, a condition, or its purpose and language was to delude Fraser, which would, itself, be an unprofessional act. There is no reconciling his letter and respondent's action, as he now says it was, in sending this sheet then to Fraser, with professional ethics. Considering

the letter to have been in good faith, it is strong corroboration of Fraser's insistence that Exhibit K did not accompany the bill on this trip to his office.

Again, July 3d, Thatcher, from Detroit, wrote a letter to Judge Knappen:

"Mr. Frazer and I have practically agreed on bill of exceptions in Rucki case. Will you write me at Toledo, stating where you can be reached on and after July 6th?"

We incline to accept respondent's claim that he had gone to Detroit on the afternoon of July 2d, before the bill came back to his office, and that, therefore, this letter was written under the same inspiration which caused the indictment of his letter the day before to Marshall & Fraser. Assuming, as in the case of the other, that this letter was written by an intelligent man, in full possession of his faculties, able to remember the circumstances immediately underlying the business to which it refers, and intending to write upon such facts, it is subject to precisely the same considerations. The last word from Fraser known to Thatcher was so hostile to inclusion of Exhibit K that a practical agreement was decidedly not in sight unless respondent should abandon his persistent attempt to get that matter in. Unless, therefore, we should assume that this letter was written to deceive Judge Knappen, it must be taken as inconsistent altogether with the thought that its writer had just attempted to foist again upon Fraser the very thing which was making agreement impossible.

But we cannot find respondent guilty of misconduct here on a preponderance of the evidence alone. It should be clear and convincing. That strength is furnished by respondent's conduct subsequent to July 2d, shown in his own testimony and by his letters. He says, as does Gamble, that on his return, July 6th, he personally directed that Exhibit K be bound into the then approved bill, and caused this sheet to be inserted in the one place where it was least likely to be discovered. We have examined the bill, and, given a purpose to surreptitiously insert a page, if there was a better hiding place than between pages 23 and 24, we are unable to find it. No explanation whatever is vouchsafed for placing it in the illogical and altogether out of the way place in which it was put. Had it been bound in there when the bill was sent to Fraser, we could understand how the latter could have overlooked it.

As soon as Marshall & Fraser made the facts known to Judge Knappen, the latter wrote to them as follows:

"In view of your statement, unless Mr. Thatcher will consent to eliminating the matter complained of, I will entertain a motion—if you care to make it—for the withdrawal of the bill or the elimination of the matter referred to, upon your filing an affidavit covering the facts stated in the second paragraph of your letter, and upon your giving notice of the motion to Mr. Thatcher, to whom I am sending a copy of this letter."

Matters were allowed to rest until Thatcher returned from a vacation trip. On July 24th, respondent wrote the judge:

"I have just returned from a trip in the West, and see a copy of motion filed by Marshall & Fraser to strike out that part of the bill of exceptions in Rucki v. Penna. Co. which refers to the motion for a new trial.

"I have also read my letter, written to you on July 6th, in which I stated that the bill of exceptions had been approved by counsel for the defendant. This letter was written at the time when I was preparing to leave on a vacation, and I very much regret that I did not include a statement of the fact that counsel for the defendant was still objecting to the substance of the evidence received on motion for new trial being incorporated in the bill. I fear that my letter may therefore have been misleading to you.

" * * * However, I wish to except, provided you see fit to strike out the matter in question, as I think it is proper in the bill and should remain there."

Again, five days later, he wrote to Judge Knappen:

"I do not deem the matter of very much consequence, except that I do not wish to be put in the light of having in any way attempted to mislead you. Mr. Fraser knew that this page was in the bill of exceptions, and knew that I would insist on its remaining in the bill. * * *

"I wish, however, to again expressly waive any legal technicality that may exist, by reason of the fact that the bill has already been approved. I very much regret that I did not call your attention to the fact that Mr. Fraser still objected to the bill embracing the substance of the testimony taken on motion for new trial. I was hastening to get away on a vacation and this accounts for the oversight on my part."

We note two important features in these letters—one common to both, the other appearing only in the last. He hastens to apologize for and explain an omission to state "the fact that counsel for the defendant were still objecting," etc. This, repeated substantially in the second letter, is remarkable in view of Thatcher's testimony (and Gamble's) that the bill came back from Fraser's office, July 2d, approved, and with no other comment—certainly with no objection. If their testimony can be accepted as true, and Thatcher had, in fact, in his letter of July 6th to Judge Knappen, put the statement which he now apologizes for omitting, he would have written a falsehood. His whole defense depends upon acceptance of his claim that Fraser approved the bill without objection and with Exhibit K as a part of it.

Counsel for respondent found themselves at sea to account for this, whereupon, although this hearing was then on argument, Thatcher, at his request, was permitted to open up his defense to essay the task of explanation, and, in the act, we regret to be forced to say, made a bad matter decidedly worse. He testified that when he wrote these last letters to Judge Knappen he was so exceedingly occupied with business accumulated during his absence that his mind was not impressed with the fact of Fraser's approval on July 2d, and that the thing uppermost in his mind was the emphatic protest against Exhibit K in the latter's letter of July 1st. We are given to infer from his testimony by way of "explanation" that, had he remembered, in the writing of these letters, and had he been able to give to their writing undistracted attention, he would not have apologized for omitting to refer to Fraser's protest, but would have insisted, as he now insists, that Fraser approved the bill, Exhibit K and all. The good faith of the explanation is easily tested by the letters themselves. As instances: In the letter of July 24th, in the very same paragraph in which appears his apology for an omission, which apology he says he made in forgetfulness of Fraser's later approval, and immediately preceding, occurs this passage:

"I have also read my letter written to you on July 6th, in which I stated that the bill of exceptions had been approved by counsel for defendant."

Again, in the letter of July 29th, wherein is repeated his singular apology, which he now would have the court believe was penned in a moment of forgetfulness of his main defense to opposing counsel's attack on the approved bill, and which letter is, as shown by its terms, written for the express purpose of transmitting the affidavits, that day made by himself and Gamble, offered directly to prove that Fraser had approved the bill without objection, occurs this passage:

"Mr. Fraser knew that this page was in the bill of exceptions and knew that I would insist on its remaining in the bill."

To assert, against the plainest references to Fraser's alleged position on July 2d, to which, also, the inclosed affidavits were addressed, that the apologetic passages, which are so enigmatical against his present testimony that there was an unreserved approval by Fraser on July 2d, were written when the writer was temporarily forgetting this important matter, his only defense against the attack on the bill, and when only the memory dwelt on Fraser's attitude of the day before, is to attempt a burdensome task upon the court's credulity. That this equivocation (we try to employ a mild term) was not the result of sudden impulse, but was the fruit of deliberation, is shown by the fact that the embarrassing question was put to defendant's counsel by the court during argument just before evening adjournment, and the answer, which could not be made by counsel, was attempted by respondent on reconvening of court the next morning.

It will be noticed that in his first apologetic letter to Judge Knappen respondent insisted that Exhibit K was a proper part of the bill, and demanded that, if it were stricken out, his exception should be saved. Five days later, knowing that the judge was giving Marshall & Fraser's attack on the approved and signed bill serious consideration, he wrote that he did not "deem the matter of very much consequence"— a position he also took on the hearing before us. This, after nearly a month's effort to get it in the bill! This was the main thing he wanted in that document, else his correspondence with opposing counsel belied his purpose; after the judge pointed out its lack of materiality, he spent three weeks in endeavoring to retain it in some form; within the week he is seen contending that error for which he should except would intervene on its elimination; and now, facing an inquiry into his methods which, from his own statements, have an enigmatical phase, he backs down, saying that all this uproar, created entirely by him is of "no consequence." The conclusion seems irresistible that these two letters were written to avoid an inquiry which, should he hold to the position he had maintained up to the time, might provoke a drastic criticism of conduct which he could not defend.

It is but fair that two points made by respondent before the committee (he was heard in full before this charge was formulated), and likewise before the court in the hearing, should be considered. One is that Judge Knappen could not have regarded the matter as questionable, else he would have ordered an investigation into respond-

ent's conduct. What Judge Knappen did do was to take the offending sheet out of the bill, with a finding, in polite language, that it was neither part thereof when approved by opposing counsel nor at any time proper. He also took pains, as part of his formal order, and by special indorsement on the sheet itself, to insure that Exhibit K should remain on the court files. He was not judge of the Circuit Court of the United States for this district, and sat here only by special designation. Under these circumstances, in preserving the situation, he did about all he could do. He might very properly leave initiative to those locally more interested.

The other point is that, although Fraser furnished information against the respondent upon which the state court's committee acted, and although this episode happened before the charges were filed in the state court, it was not used there. But that committee seems to have limited its consideration altogether to matters involving respondent's position at the state bar. Whether or not it passed judgment on this matter is not very controlling on this court.

Our judgment is that the record well sustains charge No. 2, and that respondent is guilty of the professional misconduct therein alleged.

[7] Charge 3 against the respondent is to the effect (its details will transpire in the subsequent consideration, for there is little in dispute about the facts) that, in the case of Guszik v. Toledo, St. Louis & Western Railroad Company, in this court, Thatcher prepared and caused his client, who was unable to read or write in any language, and who could neither speak nor understand in any degree any other language than his native Polish, to verify a reply containing important and material allegations of fact which he (Thatcher) then, and when he filed the same, knew could not be sustained on a trial of the issues raised thereby, and "yet, notwithstanding such knowledge of each and all of the facts, said Charles A. Thatcher violated his oath, as an attorney and officer of this court, of fidelity to his said client and fidelity to this court, by causing and permitting said Albert Guszik to sign and make oath to said reply, and causing and permitting the same to be filed in said case in this court."

The case was brought in April, 1908, with Thatcher as plaintiff's attorney, under a contract in writing whereby the attorney fees should be one-third of the amount of the recovery, if had without trial, and one-half in case of trial. Some time prior to October 21, 1909, Guszik enlisted in his case the services of Mrs. Spychalski, a professional interpreter for Polish people, who took him to Mr. Hartmann, a reputable attorney of Toledo, and engaged the latter to effect a settlement of the litigation. The case had dragged in this court, and that fact and the matter of Thatcher's disbarment, which had sifted into Guszik's mind in some way, gave the latter an impression that Thatcher was unable to give the business proper attention, and on the date last named the case was settled for $400; the parties negotiating being Hartmann, as counsel for Guszik, counsel for defendant, and Guszik, with Mrs. Spychalski as his spokesman. Neither of counsel present understood or spoke a word of Polish, wherefore

Guszik's complete ignorance of the English language brought Mrs. Spychalski into so vital a relation to the transaction as that Guszik could not be heard thereafter to give a reliable account of the transaction except through her. Guszik, in witness of the settlement, upon payment to him of the sum named, then made, signed by his mark, a written release to the defendant, which Mrs. Spychalski translated. This court not being then in session, the settlement was not made effective on the records. A few days later Thatcher learned of the affair, and, getting Guszik into his office, had him sign up a written .repudiation in his behalf, and caused a tender of the amount paid to be made accompanying the repudiation; respondent furnishing the money therefor.

This was October 26th. The next day, respondent, still being the attorney of record for Guszik, served notice upon defendant's counsel of the taking of depositions in the case on the 29th, and caused a subpœna to be served on Mrs. Spychalski to appear at his office as a witness for such deposition. The only purpose of this, manifestly, was to put Mrs. Spychalski on oath for Thatcher's benefit; for there was no legal excuse for taking the deposition, as the witness was a resident, in good health, and not about to depart from the city. It is clear that all the facts upon which Thatcher could rely to impeach the settlement were to be had from the testimony of the woman, for Guszik knew nothing of what any one said in English, except as she told him. Her testimony as to how the settlement was effected was vital and controlling.

Having taken the deposition, respondent, about three weeks afterwards, had Guszik verify a reply, which was promptly filed in an attempt to set aside the settlement, which had been pleaded in an amended answer. We have examined this reply, upon which is predicated respondent's misconduct in causing its verification by an illiterate man, who could not possibly read or understand it, unless translated, and in filing it as purporting to set up facts capable of proof, and we have carefully compared its allegations with the disclosures of Mrs. Spychalski, as shown by her deposition, and we are justified in saying that there are differences in material allegations between the two so radical as to warrant some criticism of respondent's agency in its preparation and filing. However, if matters had ended here, we would not consider the circumstance to demand much of the court. Some allowance must be given to the respondent's state of mind, and strict judgment ought not to be visited upon an attorney who performs such an act when smarting under the affront of having a case in which he had confidence and a financial interest settled surreptitiously. But respondent, seven months afterwards, insisted in demanding a trial of the case, when he should have known that first would come to the court's attention, necessarily, the issue raised by this reply, which he could not have hoped to support with testimony. At the trial, it appeared that there was no ground to think that the settlement was the result of fraud and deceit practiced on Guszik, as alleged in the reply, a fact which was plainly apparent by Mrs. Spychalski's deposition. The court directed a verdict against the reply;

Judge Tayler, sitting in the next to last case tried by him in Toledo, saying:

"There is not, in my opinion, a shred—not even a shred—of testimony that tends to discredit the settlement."

In the light of his conduct in pressing this ill-founded pleading upon the court in a moment when his judgment should have been stable, may we look at the act of having an ignorant client verify and file it. Still we would not accord to the matter more attention than to let respondent know that such practice deserved strong reproof, were it not for the intimate connection of this transaction with the circumstances underlying charge 4, which we now proceed to consider, and which emphasizes the gravity of respondent's action relative to the pleading.

Charge 4 is based upon these facts: When respondent heard of the settlement, he immediately sought Guszik at the house of the latter's landlady, Mrs. Kubielak. There he learned of the fact that the money had been deposited in the name of Mrs. Kubielak in a savings bank, and also obtained the number of the bank book. At the same time he successfully obtained Guszik's consent to attempt impeachment of the settlement, as above stated. He was still the latter's attorney of record, and there is no question but that his relation to Guszik for this last purpose was professional. October 26th was the day when he had Guszik in his office for the purpose of executing a written repudiation to accompany the tender back of the money. Meanwhile, and on the same day, he had prepared an affidavit in attachment and a statement of account against Guszik, and had filed them in a suit before a country justice of the peace against his client as principal debtor and Mrs. Kubielak and the bank as garnishees, alleging an indebtedness of $200 for services in the case and $9.54 expenses. He would have us infer, from the light manner in which he testifies of this transaction, that the principal part was borne by a collector; but the original papers before us and the testimony of the justice of the peace show that he personally prepared the papers and looked after the suit. For some reason unknown to us, the writs were put into the hands of a special officer, and by a remarkable coincidence that officer appeared on the scene in Thatcher's office, where Guszik was to execute the written repudiation of settlement, and there served them. It is fair to say that the respondent denies that he had any knowledge that Guszik was served in his office, and also insists that he had no part in bringing the special officer there on that occasion. It is a fact, however, that no one undertook to enlighten Guszik as to the nature of the paper which was then handed to him by the special officer, nor was he by any person put in possession of the fact that he was sued by his own attorney, and that unless he appeared before the squire on the 3d of November judgment would be taken against him. On that date judgment by default was entered for the full sum. We ought, however, to say that a Polish witness for the respondent testified that Guszik and Mrs. Kubielak told him before the return day of the summons and writ that the money had been tied up in the bank. It does not appear, however, that this conversation involved knowledge by

either of these people that they had an opportunity to appear before the court on the return day and there make defense against the claim of the respondent. Some time afterwards the respondent directed the squire to withhold execution, and, after the main case was concluded in this court seven months later, resulting in a vindication of the settlement, Guszik's money having been tied up all the time through this garnishment proceeding, respondent released the writ except as to $47, which he claimed for expenses, and the costs.

The point of the charge based upon these facts is that, having entered into the professional relation with Guszik as Guszik's attorney, and having Guszik in the office in furtherance of the business pertaining to that relation, it was unethical and unprofessional for him to permit himself to get into the adversary relation to Guszik involved in the attachment proceedings, without seeing to it that Guszik was fully aware that this relation was being assumed; and the more ignorant and helpless Guszik is seen to be the stronger appears the obligation upon respondent, as his counsel, on the one hand, to see that the poor fellow knew that Thatcher was his adversary in another relation. The committee charge that such conduct is a violation of respondent's oath of office of "fidelity to his client and to the court."

The court does not assume to criticise respondent for the mere fact that he sued Guszik for his fees. That was his right, other circumstances not considered. The criticism that does arise, in the court's judgment, is indicated above. The relation that this charge sustains to charge No. 3 is that the position in which respondent placed himself by suing Guszik under these circumstances is antithetic to the position he would have us believe he occupied in attempting to impeach the settlement. The more it is insisted that respondent should not be held for his action in preparing the reply made the subject of charge No. 3, because his heart was wrung over the imposition practiced upon poor Guszik, the more unpleasant does his action appear in becoming Guszik's adversary, and in permitting the helplessly ignorant fellow to remain unaware of that fact.

The Pole appeared before us as a witness, and was seen to be ignorant and simple almost to vacuity. His limitations appealed to sympathy. Yet we must indulge to him, even, the right to decide whether he would continue as the client of a lawyer who was suing him, and it appears palpable that every instinct which respondent would have us believe impelled him to strike at the settlement should also have suggested to him the high propriety of assuring the fact that Guszik knew he was sued by respondent before he left the latter's office.

Respondent's attempt on the stand to justify his conduct here but aggravates, by making the unethical inconsistency of these actions all the more apparent. It is that he brought the suit to tie up the money; "to hold the fund"; "to maintain the status quo" is the language. Interpreted, it seems to mean that he did this so that, if his adventure with the reply should come to a bad end, he would still have the personal benefit of the settlement; that his advance by way of the reply should be on the safe foundation of half the amount of the settlement. Something would be his whatever the event.

Reading the facts underlying charges 3 and 4 together, we are forced to the conclusion that respondent's handling of this matter after the settlement was effected was moved more by the financial interest he had in it than by any sympathy for this ignorant fellow, and that the language of the Supreme Court of Ohio applied to the Reiter-Milburn-Hudson matter (80 Ohio St. 663, 89 N. E. 87) is applicable here:

"The whole affair is a striking example of the peril to his integrity which a lawyer invites when he speculates upon a lawsuit upon a large contingent fee, and of the strain which, under the circumstances, he puts upon himself while struggling with his honor upon the one side and cupidity upon the other."

Nor do we see that the fact that respondent abandoned his contention for fees, after the settlement was upheld in the final trial, changed the matter. We do not feel a call to apply this belated virtue retroactively; besides, it appears in evidence that a project was on foot to assault his judgment against Guszik, and that, on the trial in this court, he was criticised by Judge Tayler for his conduct generally.

One more thing shown in evidence in this case may be noticed. In the trial of the Guszik Case in this court before a jury, allusion was made to the fact that respondent, attempting to impeach the settlement by the trial, had brought this suit based upon the settlement in his own behalf against Guszik. Thereupon respondent made this statement:

"Inasmuch as counsel has gone into a personal matter of a suit against Mr. Guszik by his attorney, I feel I am entitled to say to the court in the presence of the jury that such a suit was brought before his attorney knew of the fraud which had been perpetrated."

Then later on he repeats:

"The suit was brought before we knew of the fraud that had been perpetrated."

This is another one of respondent's attempts to extricate himself from an embarrassing position by an equivocal statement. The facts were, as we have seen, that the suit was brought on the same day when Guszik was in Thatcher's office, pursuant to Thatcher's invitation, for the purpose of signing a repudiation of the settlement on the ground that the Pole had been defrauded. It is not possible to conceive that this professional statement, made in the presence of the jury to Judge Tayler, was true; for the record before us shows that all the information upon which Thatcher acted on the 26th of October, 1909, in drawing up what is before us as Exhibit FF, the repudiation of settlement to accompany the tender, he had prior to the preparation and filing of his papers in the suit against Guszik.

Again, in argument by respondent himself, as in another instance, we are asked to consider that the judge before whom these matters came in some sort of review did not deem them worthy of attention, and when respondent was upon the stand the offer was made to prove that:

"Judge Tayler did not criticise the respondent in any particular for having filed the reply"

190 F.—64

Passing the question whether Judge Tayler's alleged lapse in any way affects the respondent's guilt of the matters charged, we may be pardoned, in the interest of a thorough consideration of the case, if we suggest that subsequently, all the proceedings upon trial of the Guszik case having come into this hearing by transcript because of respondent's insistence that he passed scathless through it before another judge of this court, we find that Judge Tayler, in directing a verdict against the reply did caustically criticise respondent, and reminded him that his continuance as a member of the bar of this court was not assured. Why, in June, 1910, Judge Tayler did not assume additional burdens in this division, with the appointment of a colleague to be located here the expectation of every recurring day, is well understood by every lawyer at this bar.

Respondent's act of imposing the reply in question upon the court and that of suing his unsuspecting client are so dependent upon each other for proper characterization as that each taints the other. Considered separately, something may be said in mitigation, perhaps defense; considered together, and this is the only treatment possible, the ameliorating facts pertinent to each lose efficacy, and nothing consistent with professional honor is left. We conclude that respondent's conduct was unethical and unprofessional, and was malpractice as that term is used in the rules respecting continuance at the bar of this court, of which the court should take cognizance.

[10] Removal from the bar, a position of honor, influence, and emolument, which has been attained only through much effort, is so severe a stroke that, even when the purity of legal proceedings is involved, a court confronting the unpleasant duty looks first to see if a corrective less drastic may not suffice. When the prosecution is based upon an isolated offense, unless the proved commission of a felony, it may be well to inquire whether circumstances not likely to recur, and for which, doubtless, repentance is manifested, may have been the occasion, in which case suspension, or perhaps direct reproof, only, may be a proper judgment. We are easily within bounds in the observation that hesitancy of courts and bar associations to apply the corrective of disbarment has interfered with the maintenance of the proper standard of professional ethics.

When, as in this case, there are several independent breaches, each of which is of a nature not to be lightly considered, we have a situation in which each may intensify the power of the others to reflect a character in the offender so wanting in appreciation of the honor of his profession and so likely to fail the court's confidence that it is not safe to apply any other judgment than permanent removal.

Respondent's handling of the Milburn-Hudson notes affords a criterion by which to regard the libel of Judge Morris. The two establish a standard by which proper conclusions in the Rucki Case may be assisted. These three combine to characterize the Guszik transaction, whose dual features taint each other. All these matters move in harmony to an inevitable conclusion unfavorable to respondent.

We feel a call to make great allowance for one with his back to the wall, fighting for his professional existence. It was this natural sym-

pathy which induced the court to suffer the record to be opened to testimony and exhibits which would render grotesque an ordinary lawsuit. As the charges were addressed to the sound discretion of the court, we felt that rules limiting the presentation of an ordinary cause ought not be adhered to very strictly. Anything offered which tended, even remotely or indirectly, to aid a just solution, we admitted, and the record shows very plainly that respondent availed himself of the disposition of the court to the point of abuse.

Early we were at pains to privately instruct him, with repetitions on several occasions, that there were plain and reasonable limitations to the court's indulgence in this respect. He was told with emphasis that but one issue was on trial, his alleged guilt, and that he would not be permitted to distract attention from that question by attacking other people upon collateral and immaterial matters. He was compelled to withdraw an answer which grossly offended in this regard, and which in its objectionable portions could have served no other function than to stand as a public file upon which to base an appeal to prejudice, and which was actually used in his behalf for that purpose; a copy at the time of filing having been given to the press out of his office. This episode caused an order to be entered withholding from file every paper in the cause until after submission to, and permission had of, the court—a power of censorship undoubtedly inherent in the court. Kelley v. Boettcher, 85 Fed. 55, 29 C. C. A. 14. We cannot too strongly affirm the court's earnest and, for a long time, kindly, demands upon respondent for his assistance in keeping this case out of the gutter, and for adherence to the single issue involved. Nevertheless, exercising one of the most responsible functions of his office, he commanded. in the name of this court, the attendance of witnesses in Los Angeles, Ft. Leavenworth, and Columbus, for deposition upon subjects which were so far removed from the issue on trial that no other conclusion seems possible but that the testimony was taken in defiance of the court, and to be used for the same purpose for which the suppressed answer was employed.

[8] The power to take testimony out of court is important, involving possible inconvenience to both the proposed witness, who dares not disobey the subpœna, and to opposing counsel, who remains away at the risk of his client. It is one of the rights of a member of the bar, which clearly indicates the confidential relation he sustains to the court. in that he is permitted to assume a function of the court whose process he commands upon his unsupported precipe. It is a delegation to him of the power of the court involved in his office, which is manifestly not to be used except on occasion and for purposes susceptible to justification on challenge. Statutes, as well as the common law, delimit its exercise to clearly marked emergencies and situations beyond which it may not be lawfully employed. These limitations are not infrequently overlooked, in most instances, we prefer to believe, through bad judgment or lack of reflection. To use the power for "fishing" purposes, as in the case of Mrs. Spychalski's deposition in the Guszik Case, or to serve a purely impertinent and immaterial end, as in the instances last referred to, is clearly unprofessional, to be reprehended as malpractice when indulged under circumstances in-

dicating contempt for the well-understood limitations of the right and for the honor of a profession called upon to obey as well as to administer the law. The malpractice of the respondent in this regard, as the cumulative effect of the instances cited, is so pronounced that a formal expression of the court's disapproval is demanded. We are glad to note that respondent's counsel had no office in these offenses. We do not, of course, base any final judgment against respondent because of them, for no charge is predicated thereon; but the phenomenally persistent insistence of respondent, who was beyond his counsel's control, that this wholly impertinent, and in large measure. scandalous, testimony should get into the record, against repeated adverse rulings of the court, permits us to, and we should, employ the illumination such conduct affords, to see even more clearly the want in respondent of necessary professional character, which the formal and established charges so conclusively prove.

Mr. Thatcher, by his repeated protests to the world and in this hearing, that he was unfairly and unjudicially treated in his disbarment by the Supreme Court of Ohio, forced upon us an imperative and peculiar duty, requiring in its exercise, and in the interest of a clear exposition, a somewhat extended analysis of the case in the state court, whose judgment, through the unique development of circumstances, we were compelled to review. This extensive consideration we have applied also to the facts shown against respondent for the first time in this hearing. Five months have intervened since the case was heard, and we treat it with values justified by perspective. In the mass of record before us, much of it of minute materiality, it is not impossible that some transaction may be set forth which, taken out of its context, appears to relieve respondent; but we are formulating a judgment in a faithful endeavor to give every circumstance its logical and necessary bearing, omitting nothing which aids in any reasonable degree an understanding of his attitude in any situation fundamental to the charges.

We meet the unpleasant responsibility, however, without hope that we may escape the criticism of those who will not look into the record, but persist in a blind belief that respondent is a martyr to free speech and judicial tyranny. Concluding, we disclaim any general reflection on the practice of taking causes upon contingent fees, which does not deserve indiscriminate condemnation. In too many instances, otherwise, would justice be denied to the poor and friendless, in which cases the retainer becomes a sacred duty, calling for a high sense of professional honor. Guszik's Case, in its inception, may be in point. The danger, out of which grows great embarrassment to courts, and much criticism of the practice, lies in the difficulty experienced by the attorney in keeping his personal interest out of the case, which he must do or abdicate his function as an officer of the court. Too often it seems that this contingent interest affects him to regard the case as his personal litigation, the subject-matter his personal property, and then he seems to lose the sense of proportion which should be the counsel's, and to entertain the selfishly distorted views of the client. The Reiter-Hudson, Rucki, and Guszik Cases are clear instances of what we have in mind. It seems a necessary deduction

from the facts that in each case a contingent fee blunted respondent's moral perception and dulled his ear to the call of professional honor.

We cannot end without extending the thanks of the court to counsel for respondent, that they performed a singularly arduous and unpleasant task with uniform courtesy and professional decorum, and apparently with sincere willingness to be of help to the court. That theirs was a position of embarrassment through what one, in argument, apologetically called the "temperament" of respondent, was evident at every sitting. We venture a doubt, however, that any canon of loyalty to a client required such surrenders to his will as were at times manifested. The record would be in a more favorable condition for him, had he had a more restrained part in its making. We cannot accept, as valid exculpation for respondent's offenses, that they were due to "temperament." But if it is that which framed the proposition in the Milburn letter of February 14, 1903, and which carried the improper purpose to its logical sequence in the suit; if that was what discovered license to support libels with half truths because innocuous whole truths were too "voluminous," and inspired the abortive attempt to hide in the Rucki bill the "condensed statement," and furnished the equilibrium for antagonistic positions in the Guszik Case, and found professional justification in the taking of the scandalous depositions; if respondent's professional embarrassments are due to nothing more than temperamental idiosyncrasy, we are still, in sheer judicial self-defense, forced to rule that such an affliction is at least a "sufficient cause," as phrased in our rules, to separate its possessor from the bar of this court. A condition producing such fruits is too embarrassing to and incompatible with due administration of the law to be endured.

That the respondent's infirmity, whatever it is, of which the charges have developed conclusive objective symptoms, is not temporary, is shown by not only the diversity of the outbreaks and their persistence (he maintained from July 1, 1902, to February 1, 1908, a purpose to sue Hudson in a deceiving manner), but also because of the lamentable fact that, upon the disclosure of all the questionable transactions herein, he manifests no regret, but rather defiantly assumes to ignore the significance of the most sinister acts and aggravates their effect by equivocation and by offering sheer impertinences as justifications. For more than two years he has apparently permitted, if not in fact openly encouraged, the national scandalizing of his state, through persistent misrepresentation of its highest court, and in this hearing, by a gross abuse of the court's process and of his rights either as a litigant or an attorney, he has attempted to provide for further outrage on the court which admitted him to practice, and whose confidence it has been judicially determined he has forfeited. Since that fact was so disclosed, and when it would seem that, at least, he should have reflected whether professional ethics should not be worthy of some solicitude on his part, he dealt most unprofessionally with the helpless Guszik, one of the very class of whom he poses as the special champion. Throughout this hearing he has taxed to the limit the patience of the court, even for a man in a desperate position, by tactics which transcend all professional propriety, and which were persistently indulged after the court's repeated endeavors to show him their gross impropriety. Whether

all this has been inspired by a desire to invite disbarment, that he might henceforth pose as a martyr and be the future beneficiary of a public sentiment inflamed by plausible misstatements of the attitude of the courts, or because of sheer mental and moral inability to appreciate ethical conduct, the result is the same. He permits the court no other course than to order his name stricken from its rolls.

Before this opinion was completed to be filed, and before the tenor of it was announced, an enterprising local newspaper had in type an article for publication contemporaneously with the filing of the opinion, containing the information, derived from respondent, that he had filed for the court's attention photographic copies of an ephemeral publication known as the "Independent Citizen," which circulated in the local election campaign of 1906, with the advice that he (respondent) was able to prove that the same was published by certain lawyers of the Toledo bar. We deem this information coming to the court sufficient to warrant us in stating in this opinion that upon the 4th day of February, 1911, we sent these papers to Elmer E. Davis, Esq., as president of the Lucas County Bar Association, with a communication as follows,

"I send with this a communication to me from Charles A. Thatcher, of date December 9, 1910, which, with its exhibits, is self-explanatory. This matter has been marked as filed in this court, but, not being a document entitled to filing, is not properly on the files, and that feature may be disregarded. I send it to you for presentation to the grievance committee of the Lucas County Bar Association, for such action in the premises as the Committee deems proper. I would not think of taking a matter of this kind up originally, believing that it is a matter first for the consideration of the local bar organization and of the state courts. I have notified Mr. Thatcher of my disposition of the papers."

On the same date we notified Mr. Thatcher of our action in the following communication:

"Acknowledging receipt of your communication of December 9th, preferring charges of unprofessional conduct against certain members of the Lucas county bar, who are also members of the bar of this court, therein named, I beg to say that I have referred it to the Lucas County Bar Association for the consideration of its grievance committee, and inclose herewith a copy of the letter in that behalf written by me to Prest. Davis."

To which, by special delivery letter, under date of February 6, 1911, respondent replied as follows:

"I am in receipt of your letter of February 4th, containing copy of your letter to Mr. Elmer E. Davis, president of the Toledo Bar Association, referring to my communication to you of December 9, 1910.

"*This communication was not intended to contain charges as being preferred by me, but simply to call the attention of the court to certain facts, for such action by the court, if any, as the court might deem necessary in the premises.*"

Inasmuch as the grievance committee of the Toledo Bar Association, to which it is suggested by Your Honor that the matter be referred, is without either the means or the authority to require the attendance of witnesses, and to administer an oath, and for other valid reasons, I respectfully request that you will kindly instruct Mr. Davis to return the papers and exhibits to me."

Pursuant to the request contained in this letter (the underscoring in its reproduction being ours), Mr. Davis was requested to turn these papers back into Mr. Thatcher's hands. Upon the 29th of April, Mr.

Thatcher having persisted in bringing this immaterial matter to the court's attention by way of deposition, the judge of this court wrote him as follows:

"Frankly, I am surprised that you should undertake to offer this sort of testimony in this case, after I have attempted so carefully to direct your attention to the fact that we could only try in this case the question of your responsibility for the things which are urged upon the court as warranting the striking of your name from the court rolls.

"It seems to me you ought to be in sympathy with the court's position that misconduct, if any there was, on the part of any other member of the bar, to which you were not a party, is not in any way a subject of inquiry in this case, and that no precedent of misconduct on the part of any other member of the bar could be offered by you as a defense for any misconduct of your own."

We anticipate that the purpose of the statement in the article referred to, which undoubtedly has its inspiration in the devious practices of the respondent so well exemplified by his conduct in this case, is to create the impression that the court is discriminating against him. Very likely, with respect to this court, as in regard to the state court's decision, he would like to direct attention from the enormity of his other offenses against professional propriety by asserting that his principal derelictions were the Morris circulars. Wherefore we justify this lengthening of this long opinion. We are sure that candid persons will find, in the tenor of the correspondence above given, not only that the court is no respecter of persons who offend against professional ethics, but that respondent, in disclaiming any intention to present charges against any other attorneys and in requesting this court to cause to be returned to him the papers which the court had placed in the custody of the organization which is supposed to safeguard the honor of the local bar, has deprived himself of the least opportunity to cavil at the court in this particular.

An order will be entered, directing that the name of Charles A. Thatcher be stricken from the rolls of the Circuit and District Courts of the United States for the Northern District of Ohio, as attorney, counselor, solicitor in chancery, proctor, and advocate in admiralty, and that he henceforth be debarred from appearing at the bar of either of said courts in either of these capacities.